UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RIVETZ CORP., RIVETZ INTERNATIONAL SEZC, and STEVEN K. SPRAGUE,

Defendants.

Case No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges the following against defendants Rivetz Corp. ("Rivetz"), Rivetz International SEZC ("Rivetz Int'l"), and Steven K. Sprague and demands a jury trial.

## PRELIMINARY STATEMENT

1. Between June and September 2017, defendants Rivetz, Rivetz Int'l, and Sprague offered and sold digital tokens called "RvT." More than 7,200 investors worldwide purchased RvT tokens for digital assets then worth approximately $18,000,000. Over 30% of these investors were located in the United States. Defendants marketed the RvT tokens as an investment opportunity, and they used the funds raised primarily to capitalize Rivetz's business. But, defendants' offer and sale of RvT tokens was not registered with the SEC, and investors did not receive the disclosures required by the federal securities laws.

2. Rivetz, a private company founded in 2013 and controlled by Sprague, devised the plan to raise capital by selling RvT tokens in early 2017. Sprague also created a Cayman Islands subsidiary of Rivetz, Rivetz Int'l, to serve as the entity from which Rivetz and Sprague would ultimately issue the tokens.

3. In June 2017, Rivetz posted on its website a "White Paper" written by Sprague in which Rivetz described its business model and the planned sale of RvT tokens. The White Paper claimed that Rivetz was building a "Global Attestation and Identity Network, powered by the Rivetz Token (RvT)" that aimed "to improve the security of devices on which we rely" and "to record and verify the health and integrity of the device using an RvT and blockchain technology." At the time of the offering, however, Rivetz did not have an operational product and the RvT token had no use.

4. Between July and September 2017, under Sprague's and Rivetz's direction, Rivetz Int'l offered and sold RvT tokens to the general public, including U.S. investors, raising the equivalent of approximately $18 million in Ether (a digital asset) for the primary purpose of capitalizing Rivetz's business.

5. In connection with the offering and when promoting the RvT tokens and Rivetz's business plan, Sprague promoted RvT tokens as investments, stating that the value of the token could rise due to the work Sprague and Rivetz would undertake to build a new business. Rivetz and Sprague also highlighted that RvT tokens would be listed on digital asset platforms and, later, described where RvT tokens could be resold. At the time of the offering, no goods or services could be purchased with the tokens, and the tokens could not be used in any other Rivetz product or service.

6. Defendants did not register any of these offers or sales of RvT tokens with the SEC, nor did they qualify for any exemption from the registration requirements.

7. Congress enacted the Securities Act of 1933 (the "Securities Act") to regulate the offer and sale of securities. In contrast to ordinary commerce, which often operates under the principle of caveat emptor, Congress enacted a regime of full and fair disclosure, requiring those

who offer and sell securities to provide sufficient, accurate information to allow investors to make informed decisions. Such disclosure is ordinarily provided in a "registration statement," which gives public investors financial and managerial information about the issuer of the securities, details about the terms of the securities offering and the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.

8. Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce. Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed. Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce absent an exemption.

9. The definition of "security" includes a range of investment vehicles, including stocks, bonds, and "investment contracts." Investment contracts are transactions where a person invests money in a common enterprise and reasonably expects profits to be derived from the entrepreneurial or managerial efforts of others. Numerous courts have specifically found that offers and sales of digital tokens like RvT are securities offerings. Indeed, as the Supreme Court of the United States has noted, Congress defined security broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

10. By engaging in the conduct set forth in this Complaint without a registration statement being in effect or filed or an applicable exemption, defendants have engaged in the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

11. Unless defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## JURISDICTION AND VENUE

12. The SEC brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t(b)].

13. This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)].

14. Venue in this district is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)]. At all relevant times, Sprague lived in Richmond, Massachusetts, and Rivetz's principal place of business was Sprague's home. Additionally, certain of the conduct described herein occurred within this district.

15. In connection with the conduct alleged in this Complaint, defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails. Specifically, defendants publicized the offer and sale of RvT tokens through the Internet, purchasers of RvT tokens remitted payments to defendants using the Internet, namely using the digital asset Ether, and defendants distributed RvT tokens to purchasers using the Internet.

## DEFENDANTS

16. **Defendant Steven K. Sprague**, age 58, resides in Richmond, Massachusetts and Grand Cayman Island. Sprague controls Rivetz and Rivetz Int'l. He is the President and a director of Rivetz and the CEO and a director of Rivetz Int'l. Sprague controls 40% of the voting securities of Rivetz.

17. **Defendant Rivetz Corp.** was incorporated in Delaware in 2013, and its principal place of business is Sprague's home in Massachusetts. Sprague purportedly founded Rivetz to develop software to improve the security of digital devices. Rivetz is the owner of all of the issued and outstanding securities of Rivetz Int'l.

18. **Defendant Rivetz International SEZC** is a wholly owned subsidiary of Rivetz organized in 2017 as a Special Economic Zone Company under Cayman Islands law, and is an exempted company under Cayman Islands law.

## FACTUAL ALLEGATIONS

19. Rivetz is a technology company that, during the time period at issue in the Complaint, purported to be in the business of developing software to improve the security of digital devices. Sprague controls Rivetz; in his own words, he "do[es] what's necessary . . . , [and he] do[es] what needs to be done" for Rivetz.

20. In the second quarter of 2017, Sprague began to pursue venture capital funding for Rivetz. In June 2017, however, he decided that Rivetz would instead conduct a sale of digital tokens due to the then-present "enthusiasm" for such offerings.

21. Sprague thereafter authored a "White Paper," which described Rivetz's business plan and an upcoming sale of RvT tokens, the proceeds of which would be used to finance Rivetz's business plan.

22. While writing the White Paper and otherwise planning the token sale, Sprague also caused Rivetz to create Rivetz Int'l to serve as the entity from which the RvT tokens would be issued and to which purchasers would send consideration. Rivetz Int'l was formally established under Cayman Islands law on June 22, 2017.

23. On or about June 29, 2017, Rivetz, at Sprague's direction, posted the White Paper on its website.

24. The White Paper stated that "Rivetz has a vision of a global ecosystem of cybersecurity checkpoints empowered by a blockchain microtransaction model." The document also described Rivetz's mission to build a "Global Attestation and Identity Network" that aimed "to improve the security of devices on which we rely" and "to push the edge of security to the screen of the device" using "RvT and blockchain technology."

25. According to the White Paper, the RvT token would enable "the registration of devices and attest to their cybersecurity controls" and "provide a new approach in the blockchain market designed to assure attestation and policy are fully integrated into the process." The White Paper further stated that Rivetz would use the RvT token "to enable the administration and operational security required" to accelerate the use of distributed and decentralized cybersecurity control solutions by the global market, "ushering in the new paradigm for cybersecurity architecture."

26. Rivetz's White Paper described a forthcoming "Token sale model" and stated that Rivetz would "set aside a portion of the RvT tokens to be used to incentivize the adoption of the system."

27. Soon after publishing the White Paper, Sprague contacted and reached an agreement with a Gibraltar-based online capital raising platform to "list" the RvT token offering

in exchange for Rivetz's payment of more than 3,500 Ether. He also authorized the payment of a fee to have the offering listed on an ICO listing website.

**Defendants' Offer and Sale of RvT Tokens**

28. Defendants offered and sold RvT tokens to the general public in a so-called "pre-sale" from July 10 to August 9, 2017, and an "initial coin offering" or "ICO" from August 10 to September 10, 2017 (collectively referred to herein as the "offering").

29. Rivetz, at Sprague's direction, advertised on its website, and through other websites and social media pages, that RvT tokens were available for purchase from Rivetz Int'l by individuals in the United States and worldwide.

30. RvT tokens could be purchased from Rivetz Int'l in the offering in exchange for Ether, a digital asset.

31. Defendants did not conduct any due diligence or "know your customer" inquiry as to any of the purchasers or potential purchasers of the RvT token. Defendants did not determine whether each purchaser of RvT tokens was an "accredited investor," as that term is defined in the U.S. securities laws.

32. As described in the marketing material for the offering, which Sprague directed and caused to be published on Rivetz's website and on various social media platforms, Rivetz planned to generate a total of 200 million RvT tokens. Rivetz earmarked 70 million of that total for sale.

33. Another 70 million of the total 200 million RvT tokens were "for company use, for whatever purposes we choose." Of those, 10 million were immediately available; 20 million were "locked" for one year; 20 million were "locked" for two years; and 20 million were "locked" for three years. Rivetz reserved the remaining 60 million tokens for "approved marketing and incentive purposes," with 30 million immediately available and the balance "locked" for one year.

34. In social media posts, Rivetz provided the following graphic to describe the offering and the various tranches of tokens:




35. In a Reddit post dated October 26, 2017, a Rivetz spokesperson hired by Sprague explained that the purpose of "locking" various tranches of tokens was to support the price of the token on the secondary market, which was in the best interests of all the holders of the token, including Rivetz:

> "Our intent is that it is in our interest to make tokens go up so we have access to more resources to execute on our plan. We'll use them judiciously - we're not interested in depressing the price of the token. We're interested in building a great product."

36. Defendants raised approximately $18 million worth of Ether in the offering. Approximately 7,200 investors purchased RvT tokens, including 2,160 investors in the United States.

37. Of the 70 million tokens available for sale, only 22 million were ultimately sold in the offering; the remaining 48 million went unsold. According to Rivetz's website after the offering, the unsold 48 million tokens were "locked" for one year, at which point the tokens would then be returned to the company.

38. The RvT tokens were priced at 333.333 RvT tokens for each Ether paid, or about $0.80 per RvT token using the then-current price of Ether. Defendants pooled the Ether received by Rivetz Int'l from the sale of RvT tokens.

39. On September 23, 2017, Rivetz Int'l distributed the RvT tokens to purchasers using the Ethereum blockchain. All purchasers received simultaneously the tokens each purchased.

40. Immediately following the offering, RvT tokens were listed and available for trading on multiple digital asset platforms. In the months following the offering, Rivetz used its website and social media to highlight where investors could buy and sell RvT tokens.

41. Following the completion of the offering, Rivetz and Sprague caused Rivetz Int'l to liquidate the Ether received from token purchasers, and all of the Ether was either spent or sold for U.S. dollars by March 2018.

42. Over the next year, Rivetz Int'l transferred the resulting cash to Rivetz, and Rivetz then used the cash to, *inter alia*, fund its ongoing operations, give Sprague a $1,000,000 one-time bonus, and loan Sprague $2,500,000, which he used to purchase a house in the Cayman Islands that he then leased back to Rivetz Int'l.

**Defendants' Plan to Use the Offering Proceeds to Build the Rivetz "Ecosystem"**

43. Defendants offered and sold RvT tokens to raise capital to build a profitable enterprise, and they marketed the token consistent with this intent. Rivetz and Sprague stated on social media and in other Internet forums that the proceeds of the offering would be used to build the Rivetz ecosystem. On social media, Sprague and other Rivetz spokespeople explained that the goal of the offering was to raise money to "begin bringing products to market" and "to fund the business model."

44. For example, in a July 16, 2017 YouTube interview of Sprague titled "Rivetz For Investors #1- What is Rivetz?" when asked whether the purpose of the token sale was "for marketing," "to fund the outreach," or "to get [the token] into every user's hands," Sprague replied: "it's all of the above." He further stated "it's the full commercialization of the product," because the product "still needs work still to take it to the point where [the] average consumer . . . [will] comfortably use it every day."

45. Sprague's social media statements also illustrate that the offering aimed to raise capital for the development of the company's business. In a post-offering social media post in November 2017, Sprague stated that "what you have is a really well-structured machine now. We raised about $18 million worth of Etherium . . . and that's actually a good number for a start-up. We can actually see good progress in the marketplace with that. That's a well-funded startup." He further stated, "We have been delivering product to a small group of customers and we were working to raise capital to launch the open-market version of the capability. The token sale has enabled us to execute that plan."

46. Sprague repeatedly made public statements that Rivetz decided to pursue funding for the company through the sale of a digital token, in part, in order to capitalize on the

marketplace's enthusiasm for initial coin offerings. For instance, in a July 9, 2017 interview posted on YouTube, Sprague stated that "we were seeing the ICO enthusiasm pick up, and it became very clear to me . . . that, you know, this was a very viable model to fund . . . . It seemed to me that there is a good potential funding mechanism to bring [the company's development] to bear." And, in another social media post, he stated that "it was clear … that a venture-backed company doing crypto cybersecurity would be eclipsed by an ICO that would bring along a community of participants and developers."

47. At the time it offered RvT tokens for sale, token buyers could not purchase any goods and services using RvT tokens, and the tokens had no other use in any Rivetz product or service. In fact, several months after the tokens were distributed to purchasers, Sprague stated on social media that Rivetz did not have "a specific release date" for the Rivetz app through which consumers could use the RvT token and that there was "not a panic to get there tomorrow."

48. A beta version of the product only became available to potential service providers on December 30, 2017, subsequent to the completion of the offering. As late as September 2018, Rivetz was continuing to develop and test tokens on devices and work with partners to develop uses.

49. During the offering, defendants promoted the value of RvT tokens as investments that purchasers could buy and sell on the secondary market, despite the fact that the product was not operational at the time of the offering. On social media after the distribution, Rivetz stated that it was "working with a number of exchanges" to list RvT tokens, and it provided on its website a list of and links to online platforms where investors could buy and sell RvT tokens.

50. After the distribution, defendants also highlighted trading arrangements with something called the "Bancor Network," which allowed RvT token holders to trade RvT tokens

for any other tokens on the Bancor Network. And, on December 31, 2017, Rivetz posted online that "[w]e're happy to tell you today, as a New Year's gift to our community, we are now listed on the Radar Relay exchange."

**Purchasers Had a Reasonable Expectation of Future Profits Derived From the Efforts of Rivetz and Its Agents**

51. The Rivetz ecosystem was designed to create demand and price appreciation for RvT tokens. Indeed, Sprague stated on social media that "our mission is to make the value of a token go up" by demonstrating the value of the Rivetz ecosystem to the marketplace. He also made several statements about the importance of strengthening the value of the token, including: the RvT tokens "are one of the greatest assets we have to deliver this project over the next number of years," "[o]ur shared mission is to drive value into this asset," "[t]oken value will be driven by the use and expected use models," and that "[y]ou want to drive revenue first, and then revenue will ultimately drive the valuation of tokens in the marketplace."

52. On social media chats, a Rivetz spokesperson also stated that "[w]e are working on the product now – the product we expect to increase the value of the tokens you hold."

53. In another social media post, Sprague stated that Rivetz's regulation of RvT token supply, combined with the expectation that some token holders would hold the tokens rather than use them on devices, would result in scarcity that would increase the value and price of all RvT tokens.

54. Restrictions on the RvT token – and Sprague's and Rivetz's statements about those restrictions – also illustrate that defendants focused on maintaining the RvT token's value. In a social media post explaining the uses of the RvT tokens that the company retained, Rivetz stated that half of the tokens were designed for promotional and marketing purposes and were locked for

one year "to ensure we don't use them all at once (which would likely depress the value of the token as well)."

55. In this same vein, the White Paper drafted by Sprague and published by Rivetz also outlined the connection between the growth of the ecosystem and the demand for RvT tokens. It stated that defendants' efforts would incentivize the adoption of the ecosystem and "bootstrap the environment as a core component of the strategy and long term success of the system." It stated that Rivetz would, among other things, distribute tokens to users "to promote and incentivize use and adoption of the ecosystem," distribute "test tokens that will support expansion of the ecosystem," support "third-party developers and other third parties that support expansion and promote adoption of the ecosystem," and distribute tokens to "marketing and strategic partners who market and promote the tokens and the ecosystem."

56. The tokens defendants offered and sold were intended to and did exist independently of Rivetz's purported cybersecurity and attestation product offerings. Defendants did not require that RvT tokens be loaded onto devices, and defendants stated in the White Paper that a RvT token holder could "at any time remove the tokens they put in the device" and use the value of RvT tokens "as they wish." In other words, Rivetz communicated to would-be investors that the tokens would have value even if not being used in the ecosystem.

**Investors' Profits Were To Be Derived from the Entrepreneurial and Managerial Efforts of Others**

57. Purchasers reasonably viewed the Rivetz offering as an opportunity to profit from their investments. They reasonably expected they might obtain future profits from buying RvT tokens if Rivetz was successful in its entrepreneurial and managerial efforts to develop its business.

58. Based on Rivetz's statements in the White Paper and on its website, in blog posts, in online videos and in Internet forums, purchasers reasonably believed they could pursue such

profits by speculatively trading RvT tokens, whether or not they used the RvT tokens on devices or otherwise participated in the Rivetz "ecosystem."

59. Rivetz highlighted the credentials, abilities, and management skills of its team, including but not limited to its founder (*i.e.,* Sprague), in the White Paper, on the Rivetz website, and in blogs, online videos and online forums. For example, the White Paper stated that "Rivetz's founders have played a critical role in the creation, development and adoption of Trusted Computing."

60. Rivetz also highlighted its past accomplishments and prospects for future successes. For example, in the White Paper published by Rivetz, Sprague wrote:

> **Rivetz is at the forefront of this dramatic shift from users employing dozens of user names and passwords to a device-based identity and capabilities model for connecting the online subscriber, which will increase the value, trustworthiness and quality of the subscriber to the service provider by recovering the lost value stolen by fraud, while at the same time eliminating the complex and frustrating user experience created by software-based security measures. Rivetz's proprietary technology leverages the Trusted Execution Environment capabilities built into devices to hide and process secrets in complete isolation from the risks inherent in the operating system. Rivetz's TEE-based products and services, leverage built-in hardware capabilities currently embedded on 2 billion devices. Almost all smartphones, tablets, laptops, and personal computers already contain the necessary hardware to enable a Rivetz vault for securing user access, privacy and safety. The Company's technology replaces unsecured storage of credentials and the cumbersome annoyance of multi-factor authentication with a safe space to hold and process sensitive data and secrets, assuring that only a known device in a known condition with a known user can connect to a network or service. Rivetz's simple and flexible platform brings world class security into the reach of any application developer or service provider by allowing them to quickly and cost-effectively exploit the built-in security protections contained on the latest generation of hardware.**

61. The White Paper emphasized Rivetz's "revenue producing" contracts with the Department of Defense and Homeland Security:

> **Rivetz has invested over 3 years in executing a well thought out and novel strategy to create the market and capitalize on this substantial opportunity. The Company's revenue producing contracts with the Department of Defense and the Department of Homeland Security validate and demonstrate the market value and leading-edge capabilities of Rivetz's technology. By simplifying the user experience and assuring that information is delivered as intended, Rivetz has designed a solution that seeks to unlock new models and services and provide value to users for years to come. Rivetz has the short term tactical plan to quickly engage customers to drive revenue and the long-term vision to unlock the full potential of the market.**

62. On social media, Sprague stated, "my team has a strong background in running a NASDAQ company in trusted computing," including "one of the world-class developers in the trusted computing space." Similarly, in several videos posted to YouTube during the offering, Sprague talked about the company's U.S. government contracts and other existing and planned commercial partnerships, and discussed his professional background and qualifications to run the business.

63. Defendants marketed the RvT tokens to investors who reasonably viewed the tokens as a speculative, tradeable investment vehicle that might appreciate based on Rivetz's managerial and entrepreneurial efforts.

**The RvT Token Offering Was an Offering of Securities**

64. The RvT token offering was an offer and sale of "securities" as defined by Section 2(a)(1) of the Securities Act because it constituted the offer and sale of investment contracts.

65. Defendants offered and sold RvT tokens as part of a general solicitation that included investors in the United States. Investors, including U.S. investors, purchased their RvT tokens in exchange for value, in this case another digital asset.

66. RvT token purchasers had a reasonable expectation of profits from their investment in the Rivetz enterprise. The proceeds of the Rivetz offering were intended to be used by Rivetz

to build an ecosystem that would create demand for RvT tokens, which Rivetz and Sprague said would increase the value of RvT tokens. Rivetz designed RvT tokens to have value even if not being used in the ecosystem, and, following the offering, pointed token holders and would-be token holders to digital asset trading platforms where RvT tokens were traded on the secondary markets.

67. Rivetz and Sprague made numerous statements that gave rise to token purchasers' reasonable expectation that they would profit from the success of Rivetz's efforts to develop the ecosystem and related rise in the value of RvT tokens.

68. Investors' profits were to be derived from the significant entrepreneurial and managerial efforts of others – specifically Rivetz, Rivetz Int'l, Sprague, and their agents – who were to create the ecosystem that would increase the value of RvT tokens and facilitate secondary market trading.

69. The RvT offering was structured to encourage speculative purchases, as the tokens had no use at the time of the offering. Indeed, investors' expectations were validated by Rivetz's and Sprague's statements on social media and Internet forums, where both described how the demand created by the Rivetz ecosystem combined with the scarcity of the RvT tokens would increase the value of the tokens.

70. Each defendant directly and/or indirectly offered and sold RvT tokens, engaged in steps necessary to the public distribution of the RvT tokens, and was a necessary participant in the offering of RvT tokens.

71. For example, as discussed above, Sprague controlled Rivetz and Rivetz Int'l, and Sprague made the decision to conduct (and when and how to conduct) the token offering at issue. Sprague reached out to and negotiated with the Gibraltar-based capital raising service, he caused the offering to be listed on an ICO listing service, and he personally contacted numerous potential

purchasers. Sprague was the voice and face of the offering; Sprague was the only person who spoke about the offering on YouTube and when interviewed.

72. Likewise, Rivetz published the White Paper, and a spokesperson employed by Rivetz made numerous statements on social media regarding the offering. Rivetz, along with Sprague, created and controlled Rivetz Int'l, and Rivetz was the entity identified in the offering that would purportedly use the funds raised to build out a revenue-producing product and "ecosystem." Rivetz also received and used for operating expenses the proceeds of the RvT token offering.

73. Similarly, Rivetz Int'l was the entity created by Rivetz and Sprague specifically for the purpose of conducting the offering. And, as planned, Rivetz Int'l received payments from investors, and it issued the RvT tokens at the conclusion of the offering.

74. At the time of the sale of RvT tokens, no registration statement had been filed as to the sale of those tokens, and no registration statement was in effect as to the sale of those tokens.

75. Defendants offered and sold RvT tokens without any exemption from the registration requirement.

**FIRST CLAIM FOR RELIEF**
**<u>Violation of Sections 5(a) and 5(c) of the Securities Act</u>**
**(All Defendants)**

76. The SEC re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 75, inclusive, as if they were fully set forth herein.

77. The U.S. securities laws require that companies disclose certain information through the registration with the SEC of the offer or sale of securities.

78. By engaging in the conduct described above, defendants offered and sold securities without a registration statement in effect and without an exemption from the registration requirement.

79. Each defendant directly and/or indirectly offered and sold securities without a registration statement in effect, engaged in steps necessary to the public distribution of unregistered securities, and was a necessary participant in the offering of unregistered securities.

80. As a result of the conduct described above, defendants each violated Section 5(a) of the Securities Act, which states that unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

81. Also as a result of the conduct described above, defendants each violated Section 5(c) of the Securities Act, which states that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

## PRAYER FOR RELIEF

**WHEREFORE**, the SEC respectfully requests that this Court enter a final judgment:

**I.**

Permanently restraining and enjoining Defendants Rivetz Corp., Rivetz International SEZC, and Steven K. Sprague from, directly or indirectly, violating Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)];

**II.**

Ordering Defendants Rivetz Corp., Rivetz International SEZC, and Steven K. Sprague to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

**III.**

Ordering Defendants Rivetz Corp., Rivetz International SEZC, and Steven K. Sprague to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

**IV.**

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY DEMAND**

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Date: September 8, 2021

Respectfully submitted,

/s/ Olivia S. Choe
Olivia S. Choe
Stephan J. Schlegelmilch (*pro hac vice forthcoming*)
SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
(202) 551-4881 (Choe)
(202) 551-4935 (Schlegelmilch)
ChoeO@SEC.gov
SchlegelmilchS@SEC.gov

Of Counsel:

Hane L. Kim
SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281

Dani R. Srour
SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549