UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        :
SECURITIES AND EXCHANGE COMMISSION,    :
                                                        :
                    Plaintiff,                          :
                                                        :
          v.                                            :    Case No. 3:21-cv-30092-MGM
                                                        :
RIVETZ CORP., RIVETZ INTERNATIONAL          :
SEZC, and STEVEN K. SPRAGUE,                    :
                                                        :
                    Defendants.                         :
_____    :

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW
<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

**LEAVE TO FILE GRANTED ON DECEMBER 18, 2023**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION ...................................................................................................... 1

BACKGROUND ......................................................................................................... 3

I.  THE REGISTRATION PROVISIONS OF THE SECURITIES LAWS AND THE
*HOWEY* TEST ........................................................................................................ 3

II.  THE DAO REPORT ........................................................................................... 4

UNDISPUTED FACTS ............................................................................................... 5

LEGAL STANDARD .................................................................................................. 9

ARGUMENT ............................................................................................................... 10

I.  DEEFENDANTS VIOLATED SECTION 5 BY OFFERING AND SELLING
UNREGISTERED SECURITIES ...................................................................... 10

A.  Investors Tendered Money for RvT Tokens ............................................. 11

B.  Purchasers of RvT Tokens Invested in a Common Enterprise ............... 12

C.  A Reasonable RvT Investor Would Have Expected Profits from the Efforts of Others . 14

1. ..It was evident to a reasonable investor that Defendants' ongoing efforts were vital to
the development of the Rivetz ecosystem and RvT's value ...................................... 15

2. ... Defendants promoted the potential increase in value of RvT tokens, which had little
use at the time of the ICO ............................................................................................. 19

3.  Defendants owned the large majority of RvT, and their prospects hinged on
increasing the tokens' price and usefulness .............................................................. 24

**4.   Many RvT purchasers viewed themselves as investors in search of profit** .................26

**II.   DEFENDANTS CANNOT ESTABLISH THEIR AFFIRMATIVE DEFENSES** .................27

**A.   First Defense: Failure to State a Claim**.................................................................27

**B.   Second Defense: RvT is Not a Security** .............................................................28

**C.   Third Defense: No Likelihood of Future Violations** ..........................................28

**D.   Fourth Defense: Lack of Due Process and Fair Notice**......................................28

**1.   Howey and its progeny provided Defendants with fair notice** .........................29

**2.**...**Courts routinely reject due process challenges to the application of Howey, including specifically to offers and sales of crypto assets**.................................................30

**3.   The SEC provided crypto asset-specific guidance**..........................................32

**E.   Fifth Defense: Lack of Extraterritorial Authority** ............................................33

**1.   Defendants offered unregistered securities in the United States** .....................33

**a.   The meaning of "offer" in Securities Act Section 5**.....................................34

**b.   Defendants offered RvT in the United States**..............................................35

**2.   Defendants sold unregistered securities in the United States**.........................37

**F.   Sixth Defense: Not Guilty by Proximity**...........................................................40

CONCLUSION.......................................................................................................... 40

# **TABLE OF AUTHORITIES**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012) ...................... 38

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................... 9

*Audet v. Fraser*, No. 3:16-cv-940, 2022 WL 1912866 (D. Conn. June 3, 2022) ........................ 13

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................ 13

*Barron v. Helbiz Inc.*, No. 20-cv-4703, 2021 WL 229609 (S.D.N.Y. Jan. 22, 2021) ................. 39

*Barron v. Helbiz Inc.*, No. 21-278, 2021 WL 4519887 (2d Cir. Oct. 4, 2021)............................ 39

*CFTC v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311 (S.D. Fla. 2014) ........................ 32

*CFTC v. Monex Credit Co.*, No. 8:17-cv-01868, 2021 WL 6102524 (C.D. Cal. Oct. 28, 2021). 32

*Chris-Craft Indus., Inc. v. Bangor Punta Corp.*, 426 F.2d 569 (2d Cir. 1970) ........................... 34

*Fedance v. Harris*, 1 F.4th 127, 1288-89 (11th Cir. 2021).......................................................... 21

*Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027 (2d Cir. 1974) ........................... 21

*In re Tezos Securities Litigation*, No. 17-cv-06779-RS,
    2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ........................................................... 39

*Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 99 S. Ct. 790 (1979)........................................ 11

*Irobe v. USDA*, 890 F.3d 371 (1st Cir. 2018) ................................................................. 9

*Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414 (8th Cir. 1974)............................................ 29

*Perea v. Editorial Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) .................................................. 9

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ........................................................ 12, 13

*SEC v. Ahmed*, 308 F. Supp. 3d 628 (D. Conn. 2018)................................................................. 38

*SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982) ....................................... 16, 17, 29

*SEC v. Blockvest, LLC*, No. 18 Civ. 2287, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019)............. 34

*SEC v. Bluepoint Inv. Counsel LLC*, No. 19-cv-809,
  2021 WL 5326740 (W.D. Wisc. Nov. 16, 2021) ...................................... 32

*SEC v. Brigadoon Scotch Distrib. Co., 480 F.2d 1047 (2d Cir. 1973)* ........................................ 30

*SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ........................................................... 29

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ................................................................. 10, 34

*SEC v. Edwards,* 540 U.S. 389 (2004) .............................................................................. 3, 14, 29

*SEC v. Fife*, No. 20-cv-5227, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021) ................................ 31

*SEC v. Keener*, No. 20-cv-21254, 2022 WL 196283 (S.D. Fla. Jan. 21, 2022) ........................... 31

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) ............................................................................. 4

*SEC v. Kik Interactive, Inc.* 492 F. Supp. 3d 169 (S.D.N.Y. 2020) .................................... passim

*SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974) ......................................... 29

*SEC v. Kovzan*, No. 11-2017, 2013 WL 5651401 (D. Kan. Oct. 15, 2013) ................................. 32

*SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211 (D.N.H. 2022) ....................................................... passim

*SEC v. Mut. Bens. Corp.*, 408 F.3d 737 (11th Cir. 2005) ............................................................ 15

*SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988 (N.D. Cal. 2021) ............................................... 14

*SEC v. National Securities, Inc.*, 393 U.S. 453 (1969) ............................................................. 34

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ................................................................. 3, 10

*SEC v. Revelation Capital Mgmt.*, 246 F. Supp. 3d 947 (S.D.N.Y. 2017) .................................. 38

*SEC v. Sargent*, 2022 WL 686452 (D. Mass. March 8, 2022) ..................................................... 9

*SEC v. Saxena*, 26 F. App'x 22 (1st Cir. 2001) ................................................................... 4, 9

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) ....................................................................... passim

*SEC v. Shavers*, 4:13-CV-416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ............................. 12

*SEC v. Shields*, 744 F.3d 633 (7th Cir. 2014) ......................................................................... 17

*SEC v. Smith*, No. 14-cv-192-PB, 2015 WL 4067095 (D.N.H. July 2, 2015) ......................... 4, 9

*SEC v. Telegram Grp*. Inc., 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...................................... passim

*SEC v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346 (JSR),
  2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) ................................................ 4, 12, 20, 22

*SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301 (2d Cir. 1971) .................................. 26

*SEC v. Thompson*, 732 F.3d 1151 (10th Cir. 2013) ........................................... 9

*SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2013 WL 2407172 (S.D.N.Y. June 4, 2013) ............. 37

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ........................................ passim

*United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975) ........................... 3, 14, 21

*United States v. Farris*, 614 F.2d 634 (9th Cir. 1979) .................................. 30

*United States v. Lainer*, 520 U.S. 259 (1997) ........................................ 30

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) ................................ 17, 29

*United States v. Naftalin*, 441 U.S. 768 (1979) ....................................... 34

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) ......................... 29

*United States v. Zaslavskiy*, No. 17 cr 647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) .... 5, 31

*Williams v. Block One*, 2022 WL5294189 (S.D.N.Y. Aug. 15, 2022) ........................ 39

**Statutes**

15 U.S.C. § 77aa ........................................................................ 3

15 U.S.C. § 77b(a) ..................................................................... 10

15 U.S.C. § 77b(a)(1) .................................................................. 3

15 U.S.C. § 77d ........................................................................ 10

15 U.S.C. § 77e(a) ................................................................... 3, 10

15 U.S.C. § 77e(c) ............................................................. 3, 10, 31, 33

15 U.S.C. § 77g ........................................................................ 3

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................... 9

**Regulations**

17 CFR 230.504 ........................................................................................................... 10

17 CFR 230.505 ........................................................................................................... 10

17 CFR 230.506(b) ....................................................................................................... 10

17 CFR 230.902(c)(1) ................................................................................................... 35

17 CFR 230.902(g)(2) .............................................................................................. 35, 37

17 CFR 230.902(h)(1)(i) ............................................................................................... 35

17 CFR 230.903(a)(1)-(3) ............................................................................................. 35

17 CFR 230.903(b)(2)(i) ............................................................................................... 35

17 CFR 230.903(b)(3)(i) ............................................................................................... 35

17 CFR 230.903(c)(1) ................................................................................................... 33

17 CFR 230.903(g)(2) ................................................................................................... 33

17 CFR 230.903(h)(1)(i) ............................................................................................... 33

Guidelines for the Release of Information by Issuers Whose Securities are in Registration, Rel.

    33-5180, 1971 WL 120474 (S.E.C. Aug. 1971) ...................................................... 34

*Offshore Offers and Sales*, 55 F.R. 18306-01, (S.E.C. May 2, 1990).......................................... 34

## INTRODUCTION

Rivetz Corp., a cybersecurity software company founded in 2013, sought to develop "trusted computing" technology purportedly allowing it to take a virtual snapshot of a mobile device's condition and record it to a blockchain.  Then, when an application sought to confirm a user's identity, Rivetz would check the device's real-time condition and compare it to the recorded one.  A match allegedly would confirm that the device had not been compromised.

In early 2017, Rivetz needed an infusion of operating capital.  It was pursuing traditional venture capital funding when Steven Sprague, its co-founder and CEO, attended a conference where he learned that another startup had earned tens of millions of dollars by conducting an Initial Coin Offering ("ICO"), i.e., by creating and selling crypto assets and using the proceeds to build the business.  Sprague decided to do the same: Defendants created crypto assets called RvT tokens,[1] and in mere weeks offered and sold them to raise operating capital.[2]  In doing so, Defendants offered and sold "investment contracts," a type of security.  By offering and selling those securities without having a registration statement in effect or having a valid exemption from registration, Defendants violated Section 5 of the Securities Act of 1933 ("Securities Act").

Defendants concede that they offered and sold RvT and that they did not file a registration statement with the Commission, and no exemption applied.  The only issue for the Court to decide is whether RvT tokens were investment contracts under Supreme Court's three-factor *Howey* test.  *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946); *SEC v. SG Ltd.*, 265 F.3d 42, 47 (1st Cir. 2001).  The undisputed facts establish that they were, as a matter of law.  *First*, there

---

[1] For conciseness, this memorandum sometimes refers to "RvT tokens" as "RvT."  The terms are meant interchangeably.

[2] "Defendants" include Rivetz Corp., a U.S. corporation registered in Delaware; Rivetz Int'l SEZC, a subsidiary of Rivetz Corp. registered in Grand Cayman; and Steven Sprague, the co-founder and CEO of both corporate entities.

was an investment of money because Defendants offered and sold RvT in exchange for tangible consideration in the form of other crypto assets.  *Second*, that money was invested in a common enterprise because Defendants pooled and used the ICO proceeds to develop the applications and ecosystem that would drive the value of the RvT, and because the financial fortunes of investors and defendants were tied together in that all profited equally if RvT increased in value.  *Third*, Defendants invited a reasonable RvT purchaser to expect profits derived from the efforts of others, i.e., Defendants.  Defendants repeatedly touted their expertise, the potential market for Rivetz's technology, and the fact that they expected RvT to increase in value as Rivetz developed its ecosystem and applications.  Defendants also kept a majority of the RvT they created, making clear that they had a large financial stake and incentive to increase the price of RvT in a manner that would benefit investors (and themselves).  *Finally*, ICO purchasers looked to Defendants' efforts to drive RvT adoption and value given that Rivetz itself controlled and maintained critical ecosystem functions.  In sum, when ICO purchasers bought RvT, they were investing money in a common enterprise, and they reasonably expected profits derived from the entrepreneurial efforts of others – meeting the definition of an investment contract.

Defendants seek to avoid responsibility for their unregistered securities offering by arguing that RvT was intended to be a product with utility rather than an investment contract, but purported utility is not talismanic against the securities laws.  Courts consistently have held crypto assets to be investment contracts regardless of any purported utility.

Finally, Defendants' affirmative defenses of lack of fair notice and lack of extraterritorial application of the securities laws are insufficient to escape liability.  As for fair notice, decades of judicial decisions have explained and applied *Howey* in determining whether a multitude of novel investment schemes qualified as investment contracts, and crypto assets fit comfortably

2

within that time-honored framework.  Furthermore, the Commission issued explicit guidance on *Howey*'s application to crypto assets in July 2017.  As for extraterritoriality, the undisputed facts in the record establish that Defendants offered and sold RvT tokens in the United States, thereby bringing the ICO within the compass of the federal securities laws.

## BACKGROUND

## I.   THE REGISTRATION PROVISIONS OF THE SECURITIES LAWS AND THE *HOWEY* TEST

Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c), require the offer or sale of "securities" to the public to be accompanied by the "full and fair disclosure" afforded by a registration statement filed with the SEC.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 n.10 (1953).  Registration requires disclosure of information about, among other things, the value of securities, the issuer's financial condition, and investment risks.  *See* 15 U.S.C. §§ 77g, 77aa.  Congress enacted this registration requirement "to afford the investing public a full measure of protection."  *SG Ltd.*, 265 F.3d at 47 (citation omitted).

A "security" includes an "investment contract," 15 U.S.C. § 77b(a)(1), which means an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *Howey*, 328 U.S. at 301; *SEC v. Edwards,* 540 U.S. 389, 393 (2004).  The "*Howey* test" is designed to be "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Howey*, 328 U.S. at 299; *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847-48 (1975) (Congress "sought to define 'the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security'") (citations omitted)).

3

*Howey* is an objective test.  *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 216 (D.N.H. 2022) (appeal dismissed on Oct. 14, 2023). Courts evaluate the "entirety of the parties' understandings and expectations," *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) (citing *Howey*, 328 U.S. at 297-98), to determine whether, "in light of the economic realities of the transaction," an investment contract existed.  *SG Ltd.*, 265 F.3d at 46. Courts routinely grant summary judgment to the SEC on Section 5 claims, including in determining whether something is a "security," as this objective test is typically established by undisputed facts.  *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd*., No. 23-cv-1346 (JSR), 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) (granting summary judgment in crypto asset case under Section 5); *LBRY*, 639 F. Supp. 3d at 211 (same); *SEC v. Saxena*, 26 Fed. Appx. 22, 23 (1st Cir. 2001) (affirming summary judgment on Section 5 claims); *SEC v. Kern*, 425 F.3d 143, 147-53 (2d Cir. 2005) (same); *SEC v. Kik Interactive, Inc.* 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (granting summary judgment in a crypto asset case); *SEC v. Smith*, No. 14-cv-192-PB, 2015 WL 4067095 (D.N.H. July 2, 2015) (detailing summary judgment standard and granting summary judgment on Commission's Section 5 and other claims).

## II.      THE DAO REPORT

On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* ("*DAO Report*"), regarding the issuance of a so-called "decentralized autonomous organization's" crypto token that sold the token to public investors to fund its business operations.  (SOF ¶ 165.)[3]  The report analyzed the offer and sale of "DAO tokens" and concluded they were offered and sold as investment contracts based on

---

[3] "SOF" references are to the Commission's Statement of Undisputed Facts filed herewith.

4

*Howey* and later cases.  The report "advise[d] those who would use . . . distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws." (SOF ¶ 166.)  It explained:

> Whether or not a particular transaction involves the offer and sale of a security – regardless of the terminology used – will depend on the facts and circumstances, including the economic realities of the transaction.  Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission . . . . These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization.

(SOF ¶ 167.)

The DAO Report is part of the "guidance issued by the SEC as to the scope of its regulatory authority and enforcement power" in the crypto asset space.  *United States v. Zaslavskiy*, No. 17 cr 647, 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018).

## UNDISPUTED FACTS

In May 2017, Rivetz Corp. was a 4-year-old cybersecurity software startup in need of operating capital.  (SOF ¶¶ 1, 14.)  Since its founding, Rivetz had been funded by individual private investors, and by Spring 2017, Steven Sprague was again pursuing traditional venture capital funding to build the business.  (SOF ¶¶ 13, 14.)  That plan changed in May 2017, when, as Michael Sprague, Rivetz's Chief Technical Officer (CTO) and co-founder, stated: "Steven caught the [ICO] bug when he learned from some partners at a conference that they just raised 40 million in an ICO" and "astutely note[d] that we have everything it takes to do the same."  (SOF ¶¶ 21, 22, 23.)  In mere weeks, Rivetz abandoned its pursuit of traditional funding in favor conducting an ICO in July 2017.  (SOF ¶ 15.)  It announced the ICO in a "Status Update" email on June 1, 2017, observing that "[t]he ICO market has been very hot and we believe we are providing a unique offering that combines the global base of trusted computing with the

decentralized key management and commercial models of blockchain.  We are excited by the opportunity and believe that this could secure significant resource for the company . . . ."  (SOF ¶ 16.)

Purportedly for tax reasons, Rivetz Corp. – a Delaware corporation with its principal place of business at Steven Sprague's house in Massachusetts (SOF ¶ 3) – founded Rivetz Int'l SEZC ("Rivetz Int'l"), a wholly-owned subsidiary, in Grand Cayman Island to conduct the ICO (SOF ¶¶ 27, 28, 29).[4]  Despite their formal differences, Rivetz Corp. and Rivetz Int'l functioned as a collective: Steven Sprague was CEO of both (SOF ¶¶ 1, 7); his brother Michael Sprague was CTO of both (SOF ¶¶ 2, 12); and all employees of parent Rivetz Corp. worked as contractors for subsidiary Rivetz Int'l, meaning that "everybody at Rivetz Corp. is effectively working for Rivetz International" (SOF ¶ 30).

Prior to the ICO, Steven Sprague drafted a lengthy "White Paper" explaining the company's vision for its business and technology, which he published on the Rivetz Int'l website. (SOF ¶¶ 31, 32, 33.)  The White Paper touted the Rivetz leadership team's experience and expertise, stating that they had been "part of the governance of this industry for the last 20 years" and "have played a critical role in the creation, development, and adoption of trusted computing."  (SOF ¶¶ 33, 34, 35.)  The White Paper also touted the prospects for RvT tokens, proclaiming that "[t]he market for the services and functionality of RvT tokens is potentially vast" and that they could "disrupt a portion of the trillion dollars in planned [cybersecurity] spending over the next five years."  (SOF ¶¶ 39, 40, 41, 42.)  It proclaimed that "[t]he RvT token is designed to explore the full value of the paradigm[.]"  (SOF ¶ 38.)

---

[4] Throughout this memorandum, references to "Rivetz" include Rivetz Corp., Rivetz Int'l, and Steven Sprague.  The memorandum will refer to the individual Defendants when the distinction is relevant.

Concurrently with the ICO announcement, Rivetz Corp. retained TokenMarket, a Gibraltar company, to assist with the offering.  (SOF ¶¶ 16, 151, 152.)  TokenMarket's statement of work committed it to "[l]ead investor outreach" by "[p]resenting project to pre-sale investors" in the United States, among other regions.  (SOF ¶ 153.)  TokenMarket's efforts dovetailed with Defendants' own advertising to potential United States purchasers, which included online ads and presentations to organizations and individuals.  (SOF ¶¶ 157, 158, 159, 161.)

Defendants conducted the ICO in two phases, the "Pre-Sale" and "Crowdsale," which together ran from July 10 through approximately September 10, 2017.  (SOF ¶ 49.)  Of the 200 million total RvT tokens that Defendants created, they offered a total of 70 million – 35% – to purchasers, retaining for themselves the remaining 65% of tokens as well as any not purchased in the ICO.  (SOF ¶¶ 46, 47, 48.)  In the Pre-Sale, Defendants offered 45 million RvT tokens to purchasers with a minimum purchase of 50,000 tokens; in the subsequent Crowdsale, they offered 25 million tokens, plus any remaining tokens from the Pre-Sale, with no minimum purchase.  (SOF ¶ 47.)[5]

Approximately 7,400 purchasers participated in the ICO, 30% of whom were in the United States.  (SOF ¶¶ 148, 149, 150.)  Of the 70 million RvT offered, Defendants sold approximately 30 million.  (SOF ¶ 58.)  Consequently, because the 40 million unsold tokens remained in Defendants' control, they retained ownership of approximately 170 million RvT, or 85% of the total supply, making them by far the largest holders.  (SOF ¶¶ 59, 85.)  The ICO

---

[5] Rivetz also offered bonus tokens as a reward for purchasing large quantities of tokens. (SOF ¶ 47).  The ICO's various token limits were exclusive of bonus tokens.  (*Id.*)

raised approximately $18 million.[6]  As Steven Sprague remarked shortly thereafter, "that's actually a good number for a start-up. . . .  That's a well-funded start-up."  (SOF ¶ 88a.)

Although Defendants used some of the ICO proceeds to hire new employees and to work on the promised technology, they also used substantial sums in ways not disclosed to ICO purchasers.  For example, Rivetz Int'l made $2.5 million in unsecured loans to Steven Sprague and his wife to purchase and renovate "Rum Baron," a waterfront house on Grand Cayman Island, and to build a swimming pool on its grounds.  (SOF ¶¶ 135-140.)  Rivetz Int'l then used additional ICO proceeds to rent Rum Baron from Steven Sprague and his wife for more than the amount of their mortgage payments.  (SOF ¶¶ 141, 142.)

Although ICO purchasers parted with large sums in exchange for RvT tokens, at the time of the ICO, those tokens had little practical use or short-term prospect of it – no services used RvT tokens or accepted them as payment, and the prices of any future services were unknown.  (SOF ¶ 53.)  Indeed, when the tokens were distributed in September 2017, no commercially available products interfaced with them in any way.  (SOF ¶¶ 101, 102, 109, 110.)  In the words of Amy Vernon, Rivetz's VP of Community, RvT "could not be used yet . . . [b]ecause the technology to use it was still being built."  (SOF ¶ 105.)  Michael Sprague agreed that Rivetz "really had to go through the ICO so that [it] could get the infrastructure in place so [it] could then actually deliver on the promise . . . . [Y]ou need your raw material in order to build your product."  (SOF ¶ 108.)  Defendants' ongoing efforts were required to drive token value by developing products that would make investors' tokens useful (SOF ¶¶ 112, 113, 114), maintaining the computer infrastructure that would enable the attestation services (SOF ¶¶ 62,

---

[6] Because purchasers paid for their RvT in Ether coins instead of dollars, the ICO raised approximately 50,000 Ether, which at the time were worth around $18 million.  (SOF ¶¶ 57, 58.)

63, 64, 66, 67, 68, 69), and building tools that would permit third-party developers to create their own services on Defendants' envisioned platform (SOF ¶¶ 66, 111, 116c, 121, 122, 123, 124, 125).

The profit-making opportunity was accordingly clear for speculative investors. As Defendants touted, investors stood to profit if Defendants succeeded in building something useful around the fixed supply of RvT, because the tokens were transferrable to others for an agreed price. (SOF ¶¶ 44, 88c.) Indeed, Defendants often acknowledged their attention to token price and that their success in making RvT useful would increase token value: they stressed, among other things, that "RvT is a long hold" not "a quick-hit moneymaker," and that "our mission is to make the value of a token go up." (SOF ¶¶ 88b, 88c, 89a, 89b, 89c, 90, 91.) Defendants also noted the alignment of their own financial fortunes with those of investors, explaining that Defendants' large holdings of RvT meant that "it is in our interest to make tokens go [up] so we have access to more resources to execute on our plan." (SOF ¶¶ 86, 88b, 89a, 90.)

## LEGAL STANDARD

Summary judgment is warranted when, as here, there are "no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law." *Perea v. Editorial Cultural, Inc.*, 13 F.4th 43, 50 (1st Cir. 2021) (quoting *Irobe v. USDA*, 890 F.3d 371, 377 (1st Cir. 2018)) (cleaned up). Factual disputes immaterial to the legal issues under review do not prevent summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]").

"[T]he ultimate question of whether an instrument is a security is a question of law and not of fact." *SEC v. Thompson*, 732 F.3d 1151, 1160-61 (10th Cir. 2013) (citation omitted)

(collecting cases).  Courts therefore routinely grant summary judgment on Securities Act Section

5 claims alleging that an instrument is a security under *Howey*.  *See* Fed. R. Civ. P. 56(a); *SEC v.

Sargent*, 19-cv-11416, 2022 WL 686452, at *24 (D. Mass. March 8, 2022) (granting summary

judgment on Section 5 claim); *LBRY*, 639 F. Supp. 2d at 211 (same); *Smith*, 2015 WL 4067095

(same); *see also Saxena*, 26 Fed. Appx. at 23 (affirming summary judgment on Section 5

claims).  This Court should do so given that there is no genuine dispute as to the material facts

establishing that Defendants engaged in unregistered offers and sales of "investment contracts."

## ARGUMENT

The undisputed facts establish that Defendants' ICO was an unregistered offer and sale of

investment contracts that violated Section 5 of the Securities Act, and their affirmative defenses

do nothing to alter that conclusion.

## I.   DEEFENDANTS VIOLATED SECTION 5 BY OFFERING AND SELLING UNREGISTERED SECURITIES

Sections 5(a) and 5(c) of the Securities Act make it "unlawful for any person, directly

or indirectly" to "sell," "offer to sell," or "offer to buy" a "security" unless a registration

statement is in effect or has been filed as to that security.  15 U.S.C. §§ 77e(a), (c).  Section

2(a)(1) of the Securities Act defines "security" to include "an investment contract."  15 U.S.C.

§ 77b(a).  To prove Defendants violated Section 5, the Commission must show that Defendants

(i) offered or sold securities (ii) in interstate commerce (iii) without filing a registration

statement.  *LBRY*, 639 F. Supp. 3d at 215 (citations omitted).  Defendants concede that they

offered and sold RvT (SOF ¶¶ 58, 59, 160), and that Rivetz had no registration statement filed

or in effect (SOF ¶ 52).  No exemption applies.[7]  Finally, Defendants cannot credibly dispute

---

[7] "Once a prima facie case [of Section 5 liability] has been made, the defendant bears the burden of proving the applicability of an exemption."  *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13

that they used interstate commerce, because they used websites and the internet to conduct the offering and sale and to deliver RvT to purchasers thereafter.  The only question left to resolve is whether Defendants offered and sold RvT as investment contracts.

The Supreme Court defined "investment contracts" in *Howey*, 328 U.S. at 293, and courts have continuously re-confirmed and applied this definition in cases alleged to involve investment contracts.  There are three parts to the *Howey* test:  (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived from the efforts of the promoter or a third party.  *SG Ltd.*, 265 F.3d at 47 (citing *Howey*).  The First Circuit has emphasized that the focus must be on the "economic realities" of the transaction.  *Id.*  The undisputed evidence shows that Rivetz offered and sold RvT as investment contracts.

### A.       Investors Tendered Money for RvT Tokens

RvT purchasers invested money by paying for RvT using ether, a crypto asset.  (SOF ¶¶ 57, 58.)  "The determining factor is whether an investor 'chose to give up a specific consideration.'"  *SG Ltd.*, 265 F.3d at 48 (quoting *Int'l Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979)).  The exchange of crypto assets constitutes an investment of money.

---

(2d Cir. 2006) (citing *Ralston*, 346 U.S. at 126).  When asked in an interrogatory, Defendants failed to identify any applicable exemption (SOF ¶ 52) – thereby conceding the absence – and there is none.  Section 4(a) of the Securities Act, 15 U.S.C. § 77d, along with Regulations S and D, exempt from the registration requirement certain specified transactions.  Because Defendants' offering involved directed selling efforts in the United States, and because some of the offers and sales were made in the United States, the offerings were not exempt under Rules 901 or 903 of Regulation S.  Because reasonable steps were not taken to verify the accredited status of the investors, the single exemption designed for offerings involving general solicitation, Rule 506(c), also did not apply.  No other exemption was available for the offering.  The private offering exemption of Securities Act Section 4(a)(2) and the Rule 504, 505 and 506(b) exemptions of Regulation D were unavailable because Defendants engaged in general solicitation through their website, through investor conferences held in the United States and/or virtually, and through podcasts.  17 CFR §§ 230.504, 505, and 506(b).  The intrastate transaction exemptions were unavailable because investors resided in multiple states, and because offers were made to potential investors throughout the United States.

*See SEC v. Shavers*, No. 4:13-CV-416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013)

(holding that an investment of Bitcoin constitutes "money" for purposes of the first prong of

*Howey*); *Terraform*, 2023 WL 8944860, at *4 (finding Section 5 violation where crypto asset

was offered for Bitcoin).  RvT purchasers' exchange of ether for RvT constitutes an investment

of money.

### B.      Purchasers of RvT Tokens Invested in a Common Enterprise

*Howey*'s second prong considers the existence of a common enterprise.  In the First

Circuit, a "common enterprise" exists if there is "horizontal commonality."  *See SG Ltd.*, 265

F.3d at 49.  Some circuits also recognize vertical commonality.  Defendants' ICO satisfies both.

Horizontal commonality exists because Defendants pooled investors' payments to fund

the development and growth of the Rivetz ecosystem.  (SOF ¶ 60.)  The financial fortunes of all

RvT investors were intertwined – if RvT increased in value, then all RvT holders would share in

that increased value on a pro rata basis.  *See, e.g.*, *Kik*, 492 F. Supp. 3d at 178 (horizontal

commonality exists as to crypto asset trading in the market because, "[r]ather than receiving a

pro-rata distribution of profits, which is not required for a finding of horizontal commonality,

investors reaped their profits in the form of the increased value of" the traded asset).  Applying

the *Kik* reasoning here:

> "This is the nature of a common enterprise, to pool invested proceeds to . . . increase
> the range of goods and services that holders of [RvT] would find beneficial to buy
> and sell with [RvT] … The stronger the ecosystem that [Rivetz] built, the greater
> the demand for [RvT], and thus the greater the value of each purchaser's
> investment."

*Kik*, 492 F. Supp. 3d at 179 (internal citation omitted).  *See also Telegram*, 448 F. Supp. 3d at

370 (horizontal commonality exists because "there was a pooling of assets and . . . the fortunes

of investors were tied to the success of the enterprise as well as to the fortunes of other

12

investors"); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("[T]he value of the [crypto asset] was dictated by the success of the . . . enterprise as a whole, thereby establishing horizontal commonality.").

Under these principles, horizontal commonality exists here. RvT tokens are crypto assets identical to one another, and their market price increases or decreases together and equally. The holder of one RvT token is not entitled to fewer or more "profits" than the holder of another RvT token, and token holders "reap[] their profits in the form of the increase in value" of their tokens. *Kik*, 492. F. Supp. 3d at 178. Nor were investors' payments "segregated and separately managed, allowing for profits to remain segregated." *Id.* at 479; *see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (horizontal commonality exists where the fortunes of the investors are tied "to the success of the overall venture"); *Audet v. Fraser*, No. 3:16-cv-940, 2022 WL 1912866, at *15 (D. Conn. June 3, 2022) (horizontal commonality established as a matter of law where the price of the coin "rose and fell across the board").

Although the First Circuit has not considered whether "strict vertical commonality" establishes a common enterprise, it too is satisfied on these facts. Strict vertical commonality exists where the "fortunes of investors [are] tied to the fortunes of the promoter." *See, e.g.*, *Revak*, 18 F.3d at 87. That is true here because Defendants and ICO purchasers both held significant financial stakes in the value of RvT. Indeed, Defendants were by far the largest RvT holders, owing 85% of them following the ICO. (SOF ¶¶ 59, 85, 86, 87.) Consequently, Defendants and RvT purchasers alike would profit from any rise in RvT value (SOF ¶ 61) – their fortunes were intertwined like strands of a rope – and courts have found strict vertical commonality on similar facts. *See SEC v. NAC Found.*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021) (allegations sufficient to allege strict vertical commonality where defendants had retained

a "healthy share" of tokens for their personal and corporate coffers); *Telegram*, 448 F. Supp. 3d at 370 (strict vertical commonality where Telegram's most valuable asset was to be its token reserve and it relied on funds from the sales of its token to pay its expenses).

### C.   A Reasonable RvT Investor Would Have Expected Profits from the Efforts of Others

Finally, investments in RvT satisfy the third prong of the *Howey* test – purchasers had a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 U.S. at 852.[8]  "Profits" include "capital appreciation from the original investment."  *SG Ltd.*, 265 F.3d at 53; *Edwards*, 540 U.S. at 394 (profits include "the increased value of the investment").  Critically, profit potential need not be the sole reason why a purchaser buys the asset; even when the profit expectation accompanies another motive, such as using the asset for a functional purpose, the requisite profit expectation exists and the test is satisfied.  *See LBRY*, 639 F. Supp. 3d at 221; *Telegram*, 448 F. Supp. 3d at 371.  Here, RvT purchasers expected to profit – in in the form of an increase in RvT token price – if Defendants successfully attracted demand for the token based on its supposed functionality on platforms Defendants or others developed.  That some ICO purchasers also might have considered one day using RvT to purchase cybersecurity services – something they could not do at the time of the ICO because Defendants had yet to build such services – does not negate their profit expectation.

---

[8] Although the Court in *Howey* stated that the expected profits from an investment must be due "solely" to the efforts of a promoter or a third party (328 U.S. at 299), "[t]he courts of appeals have been unanimous in declining to give literal meaning to the word "solely."  *SG Ltd.*, 265 F.3d at 55.  Instead, the requirement is met when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."  *Id*. (citations omitted).

**1.      It was evident to a reasonable investor that Defendants' ongoing efforts were vital to the development of the Rivetz ecosystem and RvT's value**

Defendants' rhetoric and marketing materials, and the practical and technical realities of the cybersecurity ecosystem they sought to build, made it clear from the beginning that an investment in RvT was a long-term bet on the success of Rivetz and its leadership.  "The efforts of promoters, undertaken either before or after gaining control over investor funds, are relevant considerations due to *Howey*'s focus on economic realities." *Telegram*, 448 F. Supp. 3d at 375 (citation omitted)); *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 743-44 (11th Cir. 2005) (explaining that "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether *Howey*'s test is satisfied) (citation omitted)).

Defendants' White Paper repeatedly emphasized that Defendants had deep, even unique, expertise in trusted computing and cybersecurity that they could leverage into an industry-disruptive technology, increasing demand for the RvT token.  It touted that "[t]he Rivetz team brings years of experience and leadership in trusted computing and blockchain technologies. . . . The company leadership was part of the founding of the Trusted Computing Group in 2000 and has been an active blockchain cybersecurity contributor since 2013."  (SOF ¶ 33.)  It reiterated that "Rivetz' leadership has been part of the governance in this industry from the last 20 years, driving the adoption of trusted computing hardware and developing the technology companies to support their commercial TEE solutions and potentially add billions more of devices that can utilize the Company's capabilities."  (SOF ¶ 34.)  And it stated: "Rivetz's founders have played a critical role in the creation, development, and adoption of Trusted Computing."  (SOF ¶ 35.)  The

15

plain message was that Defendants – not any individual purchaser – would do the work to increase the value of an RvT investment, and purchasers should trust them to perform capably.

While touting their deep expertise in trusted computing, Defendants simultaneously highlighted the technical challenge and resource-intensive nature of efforts to develop effective cybersecurity technologies, underscoring that a typical prospective purchaser could not hope to solve those problems without relying on others' efforts. *See SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 583-84 (2d Cir. 1982) (reasoning that the issue is not whether it was possible for any investor to make use of instrument without promoter's assistance, but instead whether it was reasonable for a typical investor to do so). Defendants' White Paper explained:

> The Rivetz solution . . . is built on a foundation of two global technologies. The first is the investment by industry of billions of dollars in trusted computing and global platform standards and the billions of devices that have been delivered with these capabilities embedded. The second is the revolutionary technology of blockchain that provides the decentralized key management, immutable storage and micropayments on a decentralized basis. Rivetz is combining these two technologies[.]

(SOF ¶ 42a.) In Defendants' telling, combining "two global technologies" driven by billions of dollars in investment was necessary because "[o]ne of the great challenges in trusted computing is providing the proof that the [trusted execution environment] is what it says it is." *Id*. "The purpose of . . . the launch of the RvT," it continued, was "to put the last 15 years and hundreds of millions of dollars of research to work by leveraging blockchain technology[.]" (SOF ¶ 42b.) *Compare Telegram*, 448 F. Supp. 3d at 376 (promoter's audacious goal was plausible to investors and market because of promoter's existing industry role). RvT purchasers would look to Defendants' efforts to knit together the threads of divergent cybersecurity technologies into services that would require RvT to function, such that the demand for RvT would increase. Purchasers would be investing in those efforts, not their own.

16

Moreover, Defendants offered RvT tokens to prospective purchasers worldwide and on a largely indiscriminate basis.  As Steven Sprague testified: "[w]e were selling [RvT] to anyone who would be interested in using [RvT]."  (SOF ¶ 159.)[9]  Eventually, approximately 7,400 purchasers participated in the ICO.  (SOF ¶ 150.)  Courts have found an investment contract under *Howey* where "investors may be . . . so numerous, or so dispersed that they become utterly dependent on centralized management."  *United States v. Leonard,* 529 F.3d 83, 90-91 (2d Cir. 2008); *see also SEC v. Shields*, 744 F.3d 633, 647 (7th Cir. 2014) (marketing interests to "thousands of investors across the country with little or no experience in [the relevant industry]" suggests that investors were invited to look to the efforts of others); *Aqua-Sonic*, 687 F.2d at 583-84 (noting that offer was not directed at investors with experience that would enable them to use instrument without promoter's assistance, and none of the 50 investors had such experience). Especially given Defendants' emphasis on their expertise and the daunting technical challenges of the cybersecurity problem they confronted, the thousands of unvetted and diffuse ICO purchasers necessarily relied on Defendants' efforts to advance the project and enhance the value of their investments.

Defendants also retained exclusive administrative control of the RvT token smart contract on the Ethereum blockchain, a fact they made clear in the Sale Terms, which warned investors of the ongoing risk that "[the] Company may have to make changes to the specifications of the Tokens," and stated that "[the] Company reserves the right to migrate the [RvT] ERC-20 Tokens

---

[9] Defendants maintain that they offered RvT only to prospective purchasers with a demonstrated need for cybersecurity services, but their proxy for need was merely the ability to follow the directions to complete the purchase.  Such a blunt approach – which, for example, would have let Apple device users purchase RvT even though the tokens never worked on Apple devices (SOF ¶¶ 25, 26) – was hardly sufficient to eliminate the diffuse purchasers' reliance on Defendants.

to another protocol." (SOF ¶ 51(a).) Among other things, certain token functions – such as "upgrade," "RivetzRegister," and "RivetzRelease" – were available only to the smart contract administrator, i.e., Rivetz, not to investors. (SOF ¶ 74.) Sean Gilligan, Rivetz's VP of Engineering, testified that these reserved functions were significant. For example, the upgrade function "allows you to upgrade the contract and move to a newer version. This might be important if you found a bug or something like that." *Id*. He explained that such global functions "obviously, had to be limited to – you know, to Rivetz" (*id.*). Given Defendants' exclusive control of the RvT token smart contract, reasonable purchasers would have understood that the value of their RvT turned in material part on Defendants' future administrative efforts.

Finally, ICO purchasers were invited to look to Defendants' ongoing efforts to maintain two computer systems vital to the envisioned ecosystem. The first system, which Defendants referred to as the "Cybersecurity Controller" or "rivetz.net," verified that a device's real-time health matched its reference state. (SOF ¶ 82.) Those comparisons, which ensured that a device had not been corrupted since it was initially measured, were the lifeblood of Defendants' envisioned cybersecurity ecosystem. As Michael Sprague testified, "really the whole – the whole infrastructure is built on the idea of Rivetz.net brokering these – these identity relationships and the health assertions." (SOF ¶ 83.) He continued:

> Q.      So all of the transactions by which the reference state is compared to the real-time state flow through the Rivetz cyber-security controller.  Is that right?
>
> A.      Yes.
>
> Q.      And . . . the Rivetz cyber-security controller at the time, was that maintained by Rivetz?
>
> A.      Yes.
>
> \*      \*      \*
>
> Q.      And the functioning of all this depends on the adequate maintenance of the Rivetz.net server, right?
>
> A.      Yes, it does.

(SOF ¶¶ 82, 83.)  Sean Gilligan likewise testified that the critical device hashes were stored in applications that Rivetz maintained.  (SOF ¶ 81.)  Investors anticipated Defendants' efforts to maintain the cybersecurity controller, because without it their RvT tokens would have been valueless (even assuming they had functionality in the first instance).

The second system, the Rivetz Registrar, was a server that stored device IDs and service provider IDs, thus allowing end-user devices and third-party developers to gain access to the RvT ecosystem.  (SOF ¶¶ 66-69.)  If Defendants stopped maintaining the server or paying the third-party company that hosted it, the ecosystem (such as it was) would have ossified because no new devices or developers could have accessed it.  (SOF ¶ 69.)  By participating in the ICO, RvT purchasers invested in and looked to Defendants' ongoing efforts to maintain the Registrar.  Under *Howey*, this demonstrates an investment contract.

### 2.      Defendants promoted the potential increase in value of RvT tokens, which had little use at the time of the ICO

From the beginning, Defendants promoted the ICO by emphasizing the vast economic opportunity for investors.  The White Paper described "[a] global market for the services

19

powered by RvT tokens." (SOF ¶ 38.) It explained that "[t]he market for the services and

functionality of RvT Tokens is potentially vast," citing a "forecast[] that global spending on

cybersecurity products will exceed $1 trillion cumulatively over the next five years [and grow]

12-15 percent year-over-year . . . through 2021." (SOF ¶ 39, 40, 41.) In summary, it said:

> Rivetz believes that the market for distributed cybersecurity controls can not only
> be additive but can disrupt a portion of the trillion dollars in planned spending over
> the next five years. The creation of RvT as a strong token, with a business case,
> could create demand for the Rivetz new transaction based service model for device
> health and integrity. Combining the 2 billion devices already deployed with
> Trusted Computing and the emerging market of blockchain has tremendous
> potential.

(SOF ¶ 42.) The obvious message to prospective investors was that, by buying RvT, they had an

opportunity to invest on the ground floor in a disruptive technology that could bring massive

returns. *See Terraform*, 2023 WL 8944860 at *15 (finding that token was a security where

promoters "led [token] holders . . . to expect profit from a common enterprise based on

[promoter's] efforts to develop, maintain, and grow" the proposed ecosystem).

Defendants maintain that the RvT tokens cannot be securities because they had utility,

but even assuming the truth of that questionable premise – discussed further below – the mere

presence of utility does not negate the existence of an investment contract under the *Howey* test.

Certainly, the land groves that the *Howey* promoters sold the investors had utility. But, as

another court in this Circuit recently explained, "[n]othing in the case law suggests that a token

with both consumptive uses and speculative uses cannot be sold as an investment contract,"

because "otherwise, the Securities Act would be unable to adapt to the 'countless and variable

schemes devised by those who seek the use of money of others on the promise of profits'

wherever a token held some consumptive utility." *LBRY*, 639 F. Supp. 3d at 221 (quoting

*Howey*, 328 U.S. at 299). *See also Kik*, 492 F. Supp. 3d 179-80 (rejecting Kik's argument that,

20

because it had "characterized [the asset] as a medium for consumptive use," there was no investment contract); *Fedance v. Harris*, 1 F.4th 1278, 1288-89 (11th Cir. 2021) ("Plenty of items that can be consumed or used . . . have been the subject of transactions determined to be securities because they had the attributes of an investment."); *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1035 (2d Cir. 1974) (affirming district court's finding that whiskey casks were sold as investment contracts). Under the law, the inquiry is not whether the item may have been potentially used by someone, but whether it was *offered and sold* for such use, or whether, as here, it was offered and sold as an opportunity to profit from someone else's efforts. *See Forman*, 421 U.S. at 852.

Although RvT tokens' alleged utility does not alter the *Howey* inquiry, it is nevertheless notable that the utility Defendants claim was a distant and hypothetical prospect at the time of the ICO, and one that would require Defendants' long-term efforts to achieve. Shortly after the ICO, Amy Vernon found herself reminding impatient investors that Defendants viewed RvT as a "long hold" prospect, and so should they:

> [A]s we've said many times, RvT is a long hold, we never pretended we were going to the moon right away . . . . It's not even been two months since the ICO ended, and we are working on the product now. All we can ask for is patience – we are not, nor have we ever pretended to be, a quick-hit moneymaker.

(SOF ¶ 89(c) (clarifying that the phrase "going to the moon" referred to a potential astronomical increase in RvT's price).) In fact, at the time of the ICO and in the months thereafter, RvT had little use: purchasers could buy and sell RvT tokens, but they could not spend them for cybersecurity services because neither Rivetz nor any third-party developer had released products that utilized RvT. (SOF ¶¶ 101, 105, 106, 109, 110.) Michael Sprague testified that "our service providers were still in development stage[.]" (SOF ¶ 53.) Courts have found significance in such a lack of contemporaneous utility. *See Kik*, 492 F. Supp. 3d at 180 (noting

21

that "none of [the alleged] 'consumptive use' was available at the time of the distribution.  It would materialize only if the enterprise advertised by Kik turned out to be successful.").

Nor was there a Rivetz ecosystem in any meaningful sense.  (SOF ¶¶ 107, 108, 112, 113, 114.)  When asked what would have happened to the Rivetz ecosystem if the company had ceased operating in October 2017 – shortly after the ICO – Amy Vernon testified: "[T]he ecosystem wasn't really there yet.  So nothing."  (SOF ¶ 112.)  Sean Gilligan answered the same question by admitting that without Rivetz's efforts, "it would be unlikely that [the ecosystem] would – that it would function."  (SOF ¶ 114.)  And Michael Sprague confirmed that the ICO was merely the first step on a long road toward RvT's actual usefulness: "You really had to go through the ICO so that you could get the infrastructure in place so you could then actually deliver on the promise . . . .  You really need – you need your raw material in order to build your product."  (SOF ¶ 108.)  Courts have found relevant such reliance on promoters to develop and maintain an envisioned ecosystem.  *See Kik*, 492 F. Supp. 3d at 180 (development efforts by promoter "were critical because without the promised digital ecosystem, [tokens] would be worthless."); *Telegram*, 448 F. Supp. 3d at 376 (finding that "if, immediately after launch, [the promoter] and its team . . . ceased all further efforts to support the [ecosystem], the [ecosystem] and [tokens] would exist in some form but would likely lack the mass adoption, vibrancy, and utility that would enable the Initial Purchasers to earn their expected huge profits.").

Because there were no services to buy with RvT at the time of the ICO, a prospective purchaser seeking to use RvT only for cybersecurity – as opposed to speculation – could not have known what services might ultimately become available or how much they might cost.  Steven Sprague conceded the point:

> Q.      At the time of the ICO, did any prospective purchaser know how much RvT
>         would be consumed in exchange for a particular service?
>
> A.      I don't believe so.

(SOF ¶ 53.)  Without such information, a reasonable use-focused purchaser could not have

determined how many tokens to acquire.  As Michael Sprague admitted:

> Q.      So at the time of the ICO, how – how would a reasonable purchaser have
>         gone about deciding how much RvT to purchase if you don't know what
>         the apps are with certainty yet, and you don't know how much the
>         functionality would ultimately cost in RvT?
>
> A.      I don't think you do know.

(SOF ¶ 54.)  Steven Sprague agreed that "we don't know the answer."  (SOF ¶ 53.)  Given these

uncertainties, a reasonable person focused on using RvT for services likely would have waited to

buy them until desired services were available, and for a price that made sense.  In contrast,

because Defendants offered RvT when services and prices were unknown and the tokens had

little practical use, the reasonable purchaser was more likely a speculator.  *See Kik,* 492 F. Supp.

3d at 180 (holding that crypto asset transactions satisfied *Howey*'s "expectation of profits based

on efforts of others" prong because "none of [the token's] consumptive use was available at the

time of the distribution," and "[i]t would materialize only if the enterprise advertised . . . turned

out to be successful").

In sum, ICO participants were investing in Defendants' efforts to build a functional

ecosystem in which RvT could be spent.  If those efforts were successful, then investors could

share in a technology that "can disrupt a portion of the trillion dollars in planned spending" on

cybersecurity (SOF ¶ 42); if not, RvT's value would wither on the vine.  Under the *Howey*

framework, investors' expectations of profits turned on the efforts of a third party – a hallmark of

a security.

###### 3.    Defendants owned the large majority of RvT, and their prospects hinged on increasing the tokens' price and usefulness

Defendants designed the ICO to ensure that they would own the lion's share of RvT tokens afterward, thus giving them a large financial stake in the value of RvT and the success of the envisioned ecosystem.  More importantly, Defendants made sure that investors were aware of this critical fact.  The Pre-sale and Crowdsale terms explained that Rivetz Int'l would create a total of 200 million RvT tokens, of which only 70 million (35%) would be available in the ICO.  (SOF ¶¶ 46, 47.)  Consequently, Defendants were guaranteed to own at least 65% of all RvT after the ICO, but that was not all: the terms further provided that "[a]ny Sale tokens that remain unsold after the Crowdsale will be added to the Company Inventory," which the company "reserve[d] the right to use . . . for any purposes at its sole discretion."  (SOF ¶ 48.)  As it turned out, ICO purchasers bought less than half of the RvT offered, and Defendants therefore retained ownership of approximately 85% of all RvT.  (SOF ¶ 59.)

Because Defendants were guaranteed to own the majority of RvT after the ICO, a reasonable purchaser would have recognized that Defendants would capture most of the benefit of any token price increase, and that they therefore had a strong incentive to cause such an increase – ICO purchasers could come along for the ride.  Another court in this Circuit recently explained the significance of a promotor's retaining a large share of tokens in determining whether the token was a security:

> The problem for [Rivetz] is not just that a reasonable purchaser of [RvT] would understand that the tokens being offered represented investment opportunities – even if [Rivetz] never said a word about it. It is that, by retaining hundreds of millions of [RvT] for itself, [Rivetz] also signaled that it was motivated to work tirelessly to improve the value of its [ecosystem] for itself and any [RvT] purchasers. This structure, which any reasonable purchaser would understand, would lead purchasers of [RvT] to expect that they too would profit from their holdings of [RvT] as a result of [Rivetz]'s assiduous efforts. Simply put, by intertwining [Rivetz]'s financial fate with the commercial success of [RvT], [Rivetz] made it obvious to its investors that it would work diligently to develop the [ecosystem] so that [RvT] would increase in value.

*LBRY,* 639 F. Supp. 3d at 220. *See also Kik*, 492 F. Supp. 3d at 180 (finding that crypto asset was a security where promoter had "a unique incentive to increase demand for [the token] because it retained for itself 30% of the tokens created."); *Telegram*, 448 F. Supp. 3d at 378 (promoter's ownership of significant numbers of tokens during lock-up period "created a reasonable expectation among the [purchasers] that [the promoter] would continue to provide essential support for the [ecosystem] after launch").

Although Defendants' incentive to increase RvT price was unmistakable from the ICO structure and promotional materials, their subsequent public statements underscored it. Amy Vernon explained on Reddit that Defendants viewed their RvT tokens as a financial resource (SOF ¶ 89a), and Steven Sprague agreed that Defendants had a financial incentive to increase the value of the tokens they held (SOF ¶ 87). Sprague proclaimed that "there are 170 million tokens that haven't been sold. So, our mission is to make the value of a token go up" (SOF ¶ 88(b)), and predicted that a fixed token supply, coupled with an increase in demand, would cause a price spiral:

> [A] good way to think of this is . . . if we had a million devices that need $5 worth of RvT stored on them, somebody's going to have to go out and buy $5 million worth of RvT. Well, there's only $18 million worth of RvT out there, so when are you going to sell yours? . . . . For the right price, I'll sell you as many as you want, right?

(SOF ¶ 88(c).)  Around the same time, Amy Vernon publicized Steven Sprague's statement that "[o]ur intent is that it is in our interest to make tokens go up so we have access to more resources to execute on our plan."  (SOF ¶ 89(a).)  She also wrote to an inquisitive investor: "We recognize the importance of token value, and we don't want to do things to harm our community."  (SOF ¶ 91.)  In testimony, Vernon summarized the dynamic by agreeing that "Rivetz, the company, and the token purchasers had aligned interest in having the value go up."  (SOF ¶ 61.)

In sum, Rivetz's interest and intent was to increase the price of the RvT tokens offered in the ICO, and a reasonable purchaser would have anticipated profiting from those efforts.

### 4.    Many RvT purchasers viewed themselves as investors in search of profit

Finally, while the *Howey* test is an objective one, focused on the reasonable investor, it is notable that many ICO purchasers considered themselves investors in search of profit.  *See Telegram*, 448 F. Supp. 3d at 374 ("[T]he stated intent of prospective and actual purchasers . . . may be properly considered in the Court's evaluation of the motivations of the hypothetical reasonable purchaser.").  *See also SEC v. Texas Gulf Sulphur Co*., 446 F.2d 1301, 1305 (2d Cir. 1971) (finding that the testimony of individual investors "was relevant to whether [a document] was misleading to the 'reasonable investor'").  Amy Vernon, Rivetz's VP of Community, understood her job to be "about building people *who were regarding themselves as investors* into – into a community that could actually help the company achieve its goals."  (SOF ¶ 96 (emphasis added).)  She testified that "many people who participated in the ICO, their only concern was financial," and that the "majority of the users [in Fall 2017] were interested in money."  (SOF ¶ 95.)  She also observed to Steven Sprague that "[e]xisting token holders, particularly those who participated in the ICO and have (as far as they are concerned) seen their investment shrink immensely, feel they deserve something for having bought tokens early on."

26

(SOF ¶ 93.)  Viewed as a whole, her experience was that "folks who participated in the ICO . . . probably the majority of them saw this as an investment," and "most people were just watching the prices every day" "with the hope that the token would go way up in value, and they would be able to cash out and buy their Lamborghini."  (SOF ¶¶ 94, 97, 98.)

Steven Sprague likewise conceded that "[s]ome people certainly speculated."  (SOF ¶ 99.)  In a Fall 2017 interview, he reasoned that "there's some [RvT] that will end up actually funded in devices" – that is, for use – but also that there is "some portion of supply that people are holding onto because of their own purposes, their own decisions" – that is, for speculation. (SOF ¶ 88(c).)  That outcome was nearly inevitable: given that RvT tokens were freely transferrable among purchasers (SOF ¶ 44), nothing about them required functional use.

*       *       *

In sum, under *Howey*, defendants offered and sold RvT as an investment contract, i.e., a security: ICO purchasers invested money in a common enterprise with the expectation of profits to be derived from the efforts of others.  Defendants' failure to register that security before offering it to the public violated Section 5 of the Securities Act.

## II.     DEFENDANTS CANNOT ESTABLISH THEIR AFFIRMATIVE DEFENSES

In his Answer (ECF No. 25), Steven Sprague advances several affirmative defenses, but none should prevent summary judgment on liability in the Commission's favor.

### A.     First Defense: Failure to State a Claim

The Answer does not explain its argument that the Complaint fails to state a claim – it merely asserts so and moves on.  *See* ECF No. 25 at 58.  It is difficult to rebut such a vague assertion, but there are at least two arguments to which the defense might refer.  *First*, it could refer to the argument that the Securities Act has no extraterritorial application on these facts.

27

That argument is addressed below in rebutting the Fifth Affirmative Defense, which explicitly asserts it. *Second*, the defense could be referring to the motion to dismiss (ECF No. 15), which argued that the Commission had failed to state a claim because it had failed to allege horizontal commonality. The Court denied that motion (ECF No. 22), and such an argument would be meritless here because the Commission explains in detail why Defendants' offering had both horizontal and vertical commonality. *See* Argument Section I.B., *supra*.

> **B.      Second Defense: RvT is Not a Security**

The second affirmative defense is that Defendants were not required to register their offering because RvT tokens are not investment contracts. That is incorrect for the reasons stated in the Argument section, *supra*.

> **C.      Third Defense: No Likelihood of Future Violations**

Defendants' likelihood of future violations is irrelevant to whether they offered or sold unregistered securities in the summer of 2017 – the only question at issue here. Should the Commission win summary judgment on liability, the parties will have an opportunity to brief the appropriate remedies, including whether the Court should enjoin Defendants from committing future violations.

> **D.      Fourth Defense: Lack of Due Process and Fair Notice**

The fourth affirmative defense is that, in violation of their due process rights, Defendants are being prosecuted despite not being given fair notice that the ICO constituted an unregistered offering of securities. The contention is meritless; for decades, courts have applied the *Howey* test to determine whether a defendant was offering an investment contract. If crypto assets, or anything else, are offered in a way that meets *Howey*'s three prongs, an investment

contract exists and the securities laws apply.  Indeed, no court has held that a defendant offering a crypto asset lacked fair notice that Section 5 could apply.

### 1.    *Howey* and its progeny provided Defendants with fair notice

Even before *Howey*, the Supreme Court held that "the reach of the [Securities] Act does not stop with the obvious and commonplace.  Novel, uncommon, or irregular devices, whatever they appear to be, are also reached" if they operate as investment contracts.  *SEC v. C.M. Joiner Leasing Group*, 320 U.S. 344, 351 (1943).  Shortly thereafter, *Howey* confirmed that Congress defined "security" broadly to embody a "flexible rather than a static principle … capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. at 299.  Indeed, long before the SEC began charging securities law violations involving crypto assets, numerous court decisions held that novel product offerings were securities and subject to federal securities laws.  Beyond the orange grove contracts at issue in *Howey* itself, such products included: payphone leases, *see Edwards*, 540 U.S. at 389; licenses to sell dental products, *see Aqua-Sonic*, 687 F.2d at 582; films, *see Leonard*, 529 F.3d at 87-91; multi-level marketing, *see SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-79 (5th Cir. 1974); and chinchillas, *see Miller v. Cent. Cinchilla Grp., Inc.*, 494 F.2d 414, 416-18 (8th Cir. 1974).

These decisions provided additional guidance as to what conduct and characteristics sufficed to meet the *Howey* test.  "[I]t is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well," even when "the facts at issue in those decisions were not 'fundamentally similar' or 'materially similar' to the facts of the defendant's case." *United States v. Smith*, 985 F. Supp. 2d 547, 588, 589

29

(S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016)

(citing *United States v. Lanier*, 520 U.S. 259, 269 (1997)).

**2.     Courts routinely reject due process challenges to the application of *Howey*, including specifically to offers and sales of crypto assets**

The First Circuit applied the term "investment contract" to "virtual shares in an enterprise

existing only in cyberspace" over 20 years ago.  *See SG Ltd.*, 265 F.3d at 48 (If "the three-

pronged *Howey* test is satisfied, the instrument must be classified as an investment contract . . . it

is immaterial whether the enterprise is speculative or non-speculative or whether there is a sale

of property with or without intrinsic value.").  Precedent in other Circuits is even older: 50 years

ago, the Second Circuit held it was "untenable" to claim the term "investment contract" was void

for vagueness.  *SEC v. Brigadoon Scotch*, 480 F.2d 1047, 1052 n.6 (2d Cir 1973).  The court

reached that conclusion despite the defendant's making three arguments similar to Defendants'

here: that it was selling interests in a usable commodity, *id.* at 1051, that the SEC had "made no

determination yet as to coverage under the federal securities laws," *id.*, and that the SEC had

issued confusing guidance, i*d.* at 1052 n.3.  As the Ninth Circuit reasoned, it is "too late in the

day more than [78] years after the Supreme Court's decision in [*Howey*] to say that the term

'security' is impermissibly vague."  *United States v. Farris*, 614 F.2d. 634, 642 (9th Cir. 1979).

These defenses have similarly been uniformly rejected in crypto asset cases, including in

this Circuit.  In *LBRY*, 639 F. Supp. 3d at 211, the defendant argued that its blockchain token was

not a security but instead was a digital currency, and that it had not been issued through an ICO.

It argued lack of fair notice on a ground instructive here: that "the Commission historically and

consistently focused its guidance, as well as its enforcement efforts, exclusively on the issuance

of digital assets in the context of an ICO" – which, of course, is the context of the present case.

*Id.* at 221.  The court rejected LBRY's distinction and its fair notice defense, explaining that "the

30

SEC has based its claim on a straightforward application of a venerable Supreme Court precedent that has been applied by hundreds of federal courts across the country over more than 70 years." *Id.* at 22.  The same is true here; indeed, even LBRY conceded that fair notice existed in ICO cases like this one.

Another noteworthy decision is *Kik*, where the defendant advanced arguments identical to those raised by Defendants here: that the application of *Howey* to a crypto asset "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct [Section 5] prohibits," and that this was made worse by the SEC's supposed "failure to issue guidance on securities enforcement related . . . to cryptocurrencies[.]"  492 F. Supp. 3d at 182-83.  The *Kik* court rejected that argument, holding that *Howey* and its progeny "give[] a reasonable opportunity to understand what conduct and devices it covers." *Id.* (citations omitted).  The court likewise observed that the "the law does not require the Government to reach out and warn all potential violators on an individual or industry level." *Id.* (citations omitted).

*LBRY* and *Kik* involved the same violation (Section 5), the same type of investment contract (offers and sales of crypto assets), and the same procedural posture (on a summary judgment record indisputably establishing the offer and sale of investment contracts).  Those cases should end the inquiry.  *See also Zaslavskiy*, 2018 WL 4346339, at *9 ("[T]he abundance of caselaw interpreting and applying *Howey* …, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the [requisite] notice."); *SEC v. Fife*, No. 20-cv-5227, 2021 WL 5998525, at *7 (N.D. Ill. Dec. 20, 2021) ("The standard against which the SEC seeks to measure Defendants' conduct is the statute itself, the language of which Defendants and all  others even arguably involved in securities transactions

plainly have had notice.  And it is for the courts – not the parties – to determine whether …

conduct falls within the scope of the statute.").

More broadly, courts routinely reject fair notice defenses on summary judgment. *See,*

*e.g.*, *SEC v. Keener*, No. 20-cv-21254, 2022 WL 196283, at *14 (S.D. Fla. Jan. 21, 2022)

("Defendant had notice that his conduct could be unlawful based upon 'the express language of

the Exchange Act, decisions from this circuit applying the definition of "dealer," and the SEC

Guide itself[.]'…. [T]he Court is unaware of, and Defendant has failed to cite to, any authority

requiring [the SEC] to issue precise guidance on the regulations it enforces.") (citations omitted);

*SEC v. Bluepoint Inv. Counsel LLC*, No. 19-cv-809, 2021 WL 5326740, at *4 (W.D. Wisc. Nov.

16, 2021) (same); *SEC v. Kovzan*, No. 11-2017, 2013 WL 5651401, at *9-11 (D. Kan. Oct. 15,

2013) (same); *CFTC v. Monex Credit Co.*, No. 8:17-cv-01868, 2021 WL 6102524, at *20 (C.D.

Cal. Oct. 28, 2021) (granting summary judgment on fair notice defense, noting "[a]gencies are

not required to anticipate problems, promulgate general rules before performing their statutory

duties, and announce why they may proceed in one enforcement action but not in another");

*CFTC v. Hunter Wise Commodities*, 1 F. Supp. 3d 1311, 1235-27 (S.D. Fla. 2014) (same result).

This Court should do the same.

### 3.     The SEC provided crypto asset-specific guidance

Finally, in addition to the decades-long line of cases flexibly applying the securities laws

to all types of investment products, it is undisputed that, when conducting the ICO, Defendants

knew of the contemporaneously issued SEC guidance regarding offers and sales of unregistered

crypto assets.  The Commission issued the DAO Report on July 25, 2017.  (SOF ¶ 165.)  On that

date, Defendants' ICO was ongoing – it would not end until September 10, 2017.  (SOF ¶ 168.)

32

Sprague admits that he contemporaneously received and reviewed the DAO Report. (SOF ¶¶ 169, 170.)

*     *     *

Given the decades of judicial decisions applying *Howey* in myriad contexts and the contemporaneously issued SEC guidance on point, Defendants cannot claim that a person of ordinary intelligence would lack fair notice that the SEC would charge those who engaged in unregistered offers and sales of crypto assets that constitute securities. The fourth affirmative defense has no merit.

### E.      Fifth Defense: Lack of Extraterritorial Authority

The fifth affirmative defense is that the Commission "lacks extraterritorial authority over all or some of the transactions alleged in the Complaint that took place outside the United States." (ECF No. 25 at 60.) The scope of Defendants' argument is unclear, as they do not specify which transactions they challenge as beyond the scope of the Securities Act. Regardless, the Securities Act governs the entire ICO process because Defendants both offered and sold unregistered securities in the United States.

### 1.      Defendants offered unregistered securities in the United States

Defendants' extraterritoriality defense is fatally misconceived from the start, as it argues only that the Commission lacks authority over certain "transactions" alleged in the Complaint. Their meaning appears to be that the ICO sales took place overseas, an incorrect notion rebutted below, but the Court need not reach that question because Section 5 of the Securities Act does not apply to transactions alone – it also applies to *offers* to sell unregistered securities regardless of whether, or where, any eventual transaction occurs. *See* 15 U.S.C. § 77e(c) ("It shall be unlawful for any person . . . to offer to sell . . . any security, unless a registration statement has

33

been filed as to such security[.]").  Critically, "an offer in violation of Section 5(c) constitutes an

independent offense . . . regardless of whether a sale occurs or the conditions of that sale."

*Cavanagh*, 155 F.3d at 135.  Indeed, Section 5 was designed in part to empower the Commission

to stop noncompliant securities offerings before transactions are complete.  *E.g.*, *Telegram*, 448

F. Supp. 3d at 352 (preliminarily enjoining $1.7 billion offering by foreign issuer that included

U.S. investors before issuer could distribute the crypto token).  And Section 5(c) prohibits the

use of the mails to deliver an unregistered security even *after* a sale, underscoring that the

location of a transaction is too limited an inquiry.

### a.      The meaning of "offer" in Securities Act Section 5

The Supreme Court has explained that "offer" and "sale" are "statutory terms[ ] which

Congress expressly intended to define broadly . . . [and] are expansive enough to encompass the

entire selling process."  *United States v. Naftalin*, 441 U.S. 768, 773 (1979).  An offer occurs

"[w]hen it is announced that securities will be sold at some date in the future and, in addition, an

attractive description of these securities and of the issuer is furnished."  *Chris-Craft Indus. v.

Bangor Punta Corp.*, 426 F.2d 569, 574 (2d Cir. 1970).  "What is dispositive . . . is whether

defendants' conduct conditioned the public mind."  *SEC v. Blockvest, LLC*, No. 18 Civ. 2287,

2019 WL 625163, at *8 (S.D. Cal. Feb. 14, 2019) (enjoining future conduct in connection with

public distribution of crypto asset securities) (citation omitted); *Guidelines for the Release of

Information by Issuers Whose Securities are in Registration*, Rel. 33-5180, 1971 WL 120474, at

*1 (S.E.C. Aug. 1971) ("[T]he publication of information and statements, and publicity

efforts . . . which have the effect of . . . arousing public interest in the issuer or in its securities

constitutes an offer in violation of the Act.").

34

In determining what acts constitute an "offer" covered by Securities Act Section 5, courts look to SEC regulations for guidance.  *See SEC v. National Securities, Inc*., 393 U.S. 453, 465 (1969) (recognizing the SEC's authority to define the terms used in the Securities Act).  The SEC promulgated Regulation S "to clarify the extraterritorial application of the registration requirements of the Securities Act." *Offshore Offers and Sales*, 55 F.R. 18306-01, at 18306 (S.E.C. May 2, 1990).

Two provisions of Regulation S are particularly relevant here.  To be considered "extraterritorial," Regulation S provides first that there must be no "directed selling efforts . . . in the United States by the issuer, a distributor, [or] any of their respective affiliates." 17 C.F.R. §§ 230.903(a)(1)-(3), (b)(2)(i), (b)(3)(i).  "'Directed selling efforts' means any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for any of the securities being offered in reliance on this Regulation S." *Id*. § 230.902(c)(1).  Second, the issuer and its affiliates must engage only in "offshore transactions," and implement "[o]ffering restrictions."  Meeting the "only offshore transactions" standard requires that no offer be "made to a person in the United States." *Id*. § 230.902(h)(1)(i).  Implementing "offering restrictions" requires preventing the resale of securities sold offshore to U.S. persons, and including in all offering materials "statements to the effect that the securities . . . may not be offered or sold in the United States or to U.S. persons[.]" *Id*. § 230.902(g)(2).  Thus, a compliant foreign offering must prevent flow-back of securities to U.S. markets and investors.

### b.      Defendants offered RvT in the United States

Under these principles, the record clearly establishes that Defendants offered RvT to purchasers in the United States.  Steven Sprague admitted it in sworn testimony:

Q.      Is it fair to say that the ICO was offered for purchase to people in the United States except for in New York?

A.      Yes.

(SOF ¶ 160.)  That concession acknowledges the reality that Defendants engaged in significant promotional efforts to create a market for RvT in the United States and failed to take the required measures – or, indeed, any measures – to prevent United States purchasers from participating in the ICO.

*First*, Defendants took numerous steps to promote the ICO in the United States.  They first announced the ICO in an email sent from Rivetz Corp. (SOF ¶ 16), a corporation registered in the United States and with its principal place of business here (SOF ¶ 3).  U.S.-based Rivetz Corp. also retained TokenMarket (SOF ¶¶ 16, 151) to, among other things, "[l]ead investor outreach" by "[p]resenting project to pre-sale investors [in the] USA[.]"  (SOF ¶ 153.)[10]  Steven Sprague likewise promoted the ICO by making presentations to United States-based organizations and individuals.  (SOF ¶ 161.)  For example, during the early days of the ICO, he appeared on a U.S.-based podcast where, after explaining the Rivetz technology at length, he discussed the ICO and invited interested listeners to "go to Rivetz.com," the website of U.S.-based Rivetz Corp.  (SOF ¶ 157.)  And Defendants advertised the ICO online in the United States.  Bradley Rotter, a Rivetz Board member who was in the United States during the ICO, remarked just after it ended that "[t]he direct marketing was quite extraordinary as I had a Rivetz ICO ad on almost every article I would visit."  (SOF ¶ 157.)

---

[10] Although Rivetz Corp. later transferred the TokenMarket contract to Rivetz Int'l, TokenMarket was retained and began work weeks before Rivetz Int'l was founded.  (SOF ¶¶ 150, 153, 154.)  Moreover, the substance of the contract did not change, including the efforts to present the ICO to investors in the United States.

*Second*, Defendants failed to take any measures to exclude United States purchasers from the ICO.  Sprague testified:

> Q.    In your advertising, did you make any effort to exclude potential purchasers in the United States?
>
> A.    No. . . . [W]e were selling product to anyone who would be interested in using the product.

(SOF ¶ 159.)  Indeed, far from making the required statement that the tokens "may not be offered or sold in the United States or to U.S. persons," 17 C.F.R. § 230.902(g)(2), the ICO sale terms plainly contemplated that United States purchasers in forty-nine States might take part, requiring prospective purchasers to "represent and warrant that . . . [y]ou are not resident or domiciled in the state of New York or purchasing Tokens from a location in New York State[.]"  (SOF ¶ 156.) Defendants performed no "know your customer" procedures on prospective token purchasers to determine their residence.  (SOF ¶ 162.)  Sprague acknowledged that it would have been possible to block a country, such as the United States, from participating in the ICO (SOF ¶ 163), but Defendants did not do so.

These undisputed facts establish that Defendants offered unregistered securities in the United States regardless of whether, or where, any eventual transaction occurred.  *See SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2013 WL 2407172, *6 (S.D.N.Y. June 4, 2013) (Securities Act's references to "offer" means that its "proscription[s] extend[] beyond consummated transactions"). Summary judgment in the Commission's favor is therefore appropriate on the extraterritoriality defense.

### 2.    Defendants sold unregistered securities in the United States

The Securities Act encompasses the ICO for the additional reason that the *sales* of RvT were domestic.  Although the First Circuit has not announced a framework for determining

whether a sale of securities is domestic, the Second Circuit has reasoned that "[t]o sufficiently allege a domestic securities transaction in securities not listed on a domestic exchange . . . a plaintiff must allege facts suggesting that irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). "[U]nder *Absolute Activist* the SEC need only show that either of these events occurred in the United States in order to establish domesticity." *SEC v. Ahmed*, 308 F. Supp. 3d 628, 665 (D. Conn. 2018).  Courts analyze the provisions of relevant agreements to determine where these acts took place. *E.g., Ahmed*, 308 F. Supp. 3d at 669-73 (analyzing written contracts and concluding that, where "at least one party … was acting from the United States" at each of these points, "all transactions are domestic"); *see also SEC v. Revelation Cap. Mgmt., Ltd*., 246 F. Supp. 3d 947, 954 (S.D.N.Y. 2017) (analyzing the moment a party bound itself to a sale by looking at relevant definition of "sale" in the Securities Act, and noting that a "sale" occurs when the party obligates itself to perform "even if the formal performance of their agreement is to be after a lapse of time" (citation omitted)).

It is undisputed that a large percentage of the ICO purchasers acted from the United States.  Defendants themselves calculated that United States purchasers comprised approximately 30% of all RvT purchasers, and that, when weighting purchasers to account for the value of RvT they purchased, "U.S. purchasers accounted for . . . 35% . . . of RvT purchases."  (SOF ¶ 148.)  The Pre-sale and Crowdsale agreements provided that purchasers accepted Defendants' offer – incurring a "binding present obligation to purchase" – by agreeing to the terms and transmitting the purchase price to Rivetz Int'l:

38

> **Binding purchase**.  You acknowledge and agree that your acceptance of these Terms and the transmission of the Purchase Price (as defined in Exhibit B) to the send address provided by Company *constitutes a binding present obligation to purchase* the corresponding Purchase Quantity (as defined in Exhibit B) of Tokens and to pay the full Purchase Price therefor.

(SOF ¶ 50 (emphasis added).)  Because United States purchasers performed those acts domestically, that is where irrevocable liability arose.

This outcome is consistent with those that other courts have reached regarding the domesticity of ICO sales.  *E.g.*, *Barron v. Helbiz Inc.*, No. 20-cv-4703, 2021 WL 229609, *6 (S.D.N.Y. Jan. 22, 2021), *vacated and remanded on other grounds*, No. 21-278, 2021 WL 4519887 (2d Cir. Oct. 4, 2021) (holding that the transaction occurred at plaintiff's location when "he accepted the offer and agreed to the contract of purchase"); *In re Tezos Securities Litigation*, No. 17-cv-06779-RS, 2018 WL 4293341, *8 (N.D. Cal. Aug. 7, 2018) (observing that, even absent binding contractual terms, a sale took place in the United States because "contribution of Ethereum to the ICO became irrevocable only after it was validated by a network of global 'nodes' clustered more densely in the United States than in any other country.").[11]

Because *both* an offer and sale occurred in the United States – either would be sufficient – Defendants' ICO was domestic for purposes of the Securities Act, and the Court should grant summary judgment in the Commission's favor on the extraterritoriality defense.

---

[11] In *Williams v. Block One*, No. 20-cv-2809 (LAK), 2022 WL5294189 (S.D.N.Y. Aug. 15, 2022), the court held that assessing irrevocable liability required determining "the location of the node [on the Ethereum blockchain] that verified [each] specific transaction at issue."  No other Court has embraced this "original node" tracing exercise and it is not technically possible, a point the Commission is prepared to explain through an expert declaration should the Court find it useful.

### F.      Sixth Defense: Not Guilty by Proximity

The final affirmative defense is that Defendants should not be "guilty by proximity," i.e., they should not be liable under the Securities Act merely because other contemporary ICO offerings might have constituted investment contracts.  (ECF No. 25 at 60.)  Specifically, they concede that "[m]any token projects offered in 2017 unlike Rivetz had the characteristics of securities," but aver that "[t]he defendants can not be lumped into a generic circumstance for a new technology.  It must be based on the facts and circumstances specific to Rivetz."  *Id.*  The Commission agrees; its argument analyzes the specifics of Defendants' ICO, the RvT token, the purported ecosystem, and myriad statements by Defendants and associated persons, all of which compel the conclusion that they offered and sold unregistered securities.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant summary judgment in the Commission's favor.

Dated: January 8, 2024                          Respectfully submitted,

                                                /s/ *Damon W. Taaffe*
                                                Damon W. Taaffe
                                                U.S. Securities and Exchange Commission
                                                Division of Enforcement
                                                100 F Street, N.E.
                                                Washington, DC 20549
                                                (202) 551-7420
                                                taaffed@SEC.gov

                                                Attorney for Plaintiff
                                                U.S. Securities and Exchange Commission