UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>RIVETZ CORP., RIVETZ INTERNATIONAL SEZC, and STEVEN K. SPRAGUE,<br><br>    Defendants. | Civil Action No. 21-30092-MGM |

MEMORANDUM AND ORDER ON
CROSS MOTIONS FOR SUMMARY JUDGMENT
(Dkt. Nos. 36 & 37)

September 30, 2024

MASTROIANNI, U.S.D.J.

## I.    INTRODUCTION

The Securities and Exchange Commission ("SEC") filed this action against Rivetz Corp,

Rivetz Int'l SEZC, and Stephen K. Sprague ("Sprague"), alleging they offered and sold unregistered

securities, in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), when

they conducted a 2017 initial coin offering ("ICO") for an ERC-20 token on the Ethereum blockchain

called the Rivetz token ("RvT token"). Sprague contends the RvT token was a functional software

product not an investment contract and, therefore, the ICO did not involve the sale of securities

subject to registration requirements under the Securities Act. Proceeding pro se, Sprague filed a

motion to dismiss and, as counsel had not appeared on behalf of the corporate defendants, the SEC

requested a notice of default enter against them. After the default entered, the court denied Sprague's

motion, ruling that the SEC had alleged sufficient facts to support its claims that RvT tokens were

securities, specifically investment contracts as the Supreme Court defined the term in *SEC v. W.J. Howey*, 328 U.S. 293 (1946).

Following discovery, the parties filed cross motions for summary judgement. The SEC contends the court should enter judgment in its favor because the undisputed facts demonstrate RvT tokens lacked any function beyond other generic ERC-20 tokens and the economic substance of the ICO meets the *Howey* test. Sprague agrees there are no genuine issue of material fact, but argues the record establishes that RvT tokens were not investment contracts subject to regulation under the Securities Act. For the reasons that follow, the court grants the SEC's motion and denies Sprague's motion.

## II.    LEGAL STANDARD

"The function of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Burt v. Bd. of Trs. of Univ. of R.I.*, 84 F.4th 42, 59 (1st Cir. 2023) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "The fact that the parties have filed cross motions . . . does not alter these general standards." *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023). Each party's motion is reviewed "independently, viewing the facts and drawing inferences as required by the applicable standard." *Id.*

"Facts are material when they have the 'potential to affect the outcome of the suit under the applicable law,'" and disputes are genuine when a reasonable jury considering the evidence "'could resolve the point in the favor of the non-moving party.'" *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23-24 (1st Cir. 2017) (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)). "[I]f there is a genuine

dispute of a material fact, that dispute would 'need[] to be resolved by a trier of fact.'" *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 79 (1st Cir. 2018) (quoting *Kelley v. LaForce*, 288 F.3d 1, 9 (1st Cir. 2002)) (second alteration in original). Undisputed facts must be viewed "in the light most favorable to the non-moving party." *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018). The court draws all reasonable inferences in favor of the non-moving party, but does not "draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Cherkaoui*, 877 F.3d at 23 (internal quotations omitted) (emphasis in original).

A "nonmovant can forestall summary judgment by 'present[ing] definite, competent evidence' demonstrating the existence of a genuine dispute about a material fact." *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)). Generally, the court "may consider only evidence that would be admissible at trial." *Klauber v. VMware, Inc.*, 80 F.4th 1, 7 (1st Cir. 2023). In the District of Massachusetts, the presentation of such evidence is governed by Local Rule 56.1, which provides that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." D. Mass. R. 56.1. Parties typically file a statement of material facts as a separate document, but the requirements of the local rule can also be met by a statement of facts contained in a party's supporting memorandum, provided the facts are supported by citations to documents in the record. A party opposing a motion for summary judgment has a corresponding obligation to provide the court with a concise statement of material facts that are in dispute, also tied by page references to specific "affidavits, depositions and other documentation." *Id.*

Usually, the opposing party files a paragraph-by-paragraph rebuttal to the moving party's 56.1 statement of material facts and may also include additional facts that support the opposition. Such a format makes it easy for the court to identify the contested facts but is not required under the local

rule. *See McGrath v. Tavares*, 757 F.3d 20, 26 n.10 (1st Cir. 2014). Since the local rule permits the moving party to file a reply, but does not grant the opposing party an opportunity to file a sur-reply, a moving party's reply may not assert new facts. *See Knowlton v. Shaw*, 791 F. Supp. 2d 220, 268 (D. Me. 2011) (explaining that when a local rule provides for the filing of a reply but not a sur-reply, the inclusion of new facts in a reply "run[s] contrary to the requirement that the facts must be interpreted in a manner most congenial to the non-movant"). Under Local Rule 56.1, properly supported facts set forth by the moving party and not placed into dispute by record evidence cited by the opposing party are deemed admitted for purposes of the summary judgment motion. D. Mass. R. 56.1; *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . .").

### III.     UNDISPUTED MATERIAL FACTS

Both the SEC and Sprague have moved for summary judgment and so have taken the position that there are no genuine disputes as to any material facts. Consistent with the requirements of Rule 56 and Local Rule 56.1, the SEC supported its motion with a separate 56.1 statement containing numbered paragraphs, each supported by citations to specific portions of exhibits that were filed together with the 56.1 statement. (Dkt. No. 36-1.) Sprague did not file a response to the SEC's 56.1 statement and the facts set forth by the SEC are considered undisputed. He also did not file his own 56.1 statement with his motion for summary judgment, instead including facts throughout the supporting memorandum, typically without record citations, and attaching a nine-page declaration. The declaration was organized into numbered paragraphs, some of which contained general references to documents attached as exhibits. (Dkt. No. 37-1.) The court treats the facts stated in the declaration

that are within Sprague's personal knowledge as though they were set out in a properly supported 56.1 statement.

The SEC elected to respond to the facts asserted in Sprague's supporting memorandum by extracting factual statements and creating a new document listing them in numbered paragraphs, each followed by the SEC's response either identifying the fact as undisputed or challenging the basis of disputed facts. (Dkt. No. 38-1.) In addition to responding to individual facts, the SEC argued that Sprague's motion for summary judgment should be denied because it was not supported by the required statement of facts. Sprague then filed a document captioned "reply to Plaintiff's Rule 56.1 statement," in which he disputed the contents of some of the numbered paragraphs and responses included in the SEC's 56.1 response. (Dkt. No. 41-1.)

Recognizing that neither Rule 56 nor Local Rule 56.1 permit a party to put new facts before the court in a reply and that Sprague had included legal arguments, the SEC moved to strike Sprague's reply. (Dkt. No. 42.) The court denied the motion to strike, but considers the document only to the extent it identifies facts Sprague does not dispute or specific evidence that supports a fact originally stated in Sprague's supporting memorandum. The court deems admitted those facts supported by citations to the record that have not been contested with citations to other exhibits in the record.

A. Rivetz Corp.

In 2013, Sprague and his brother, Michael Sprague, founded Rivetz Corp., a Delaware corporation with a main office at Sprague's home in Richmond, Massachusetts. Before starting Rivetz Corp., Sprague was the CEO of Wave Systems Corp., a company that developed software for trusted computing. Sprague was the President and CEO of Rivetz Corp. and its largest shareholder. From 2017 through 2019, Sprague and his brother controlled more than fifty percent of Rivetz Corp. voting shares. Beginning in 2013, Rivetz Corp. worked to develop security tools to implement trusted

computing solutions for mobile devices. The company generated some income and was also funded by individual private investors. During the spring of 2017, Rivetz Corp. sought traditional venture capital funding through which investors would exchange money for a financial or ownership interest in the company. Sprague also attended a conference and learned about entities that were raising millions of dollars by issuing blockchain tokens.

On June 1, 2017, Rivetz Corp. issued a public statement announcing several updates, including a "plan to pursue a $7.5 million dollar equity transaction and secure the resources to grow the company to the next level" and a plan "to do an initial coin offering (ICO) to fund a token (Tensile) on the blockchain that will be used to power a global attestation and identity network for devices." (Rivetz June 1st Update, Dkt. 36-46 at 1-2.) Sprague's announcement noted that "[t]he ICO market has been very hot" and expressed the belief that Rivetz Corp. would be "providing a unique offering that combines the global base of trusted computing with the decentralized key management and commercial models of blockchain." (*Id.* at 2.) He also explained that Rivetz Corp. believed the ICO "could secure significant resource [sic] for the company by preselling access to the service."

Following this announcement, Rivetz Corp. did not make any further efforts to obtain traditional venture capital funding and focused instead on the ICO. Rivetz Corp. formed a wholly-owned subsidiary, Rivetz Intl. SEZC for the purpose of conducting the token sale. Sprague was a director and the CEO of Rivetz Intl., which was a Grand Cayman entity headquartered in the Cayman Islands. Rivetz Intl. did not have its own employees, but hired Rivetz Corp. to provide its staffing and Rivetz Corp. employees began working exclusively, or almost exclusively, on Rivetz Intl. matters, including the ICO.

B.   The RvT Token and Blockchain Technology

"A blockchain is an electronic distributed database 'shared among the nodes of a computer network.'" *SEC v. LBRY, Inc.*, 26 F.4th 96, 97 n.1 (1st Cir. 2022) (quoting A. Hayes, Blockchain Explained, Investopedia (updated Jan. 20, 2022), https://www.investopedia.com/terms/b/blockchain.asp/). "Ethereum is a decentralized blockchain with smart contract functionality" that runs on open-source software and its native cryptocurrency, ether, "is second only to bitcoin in market capitalization." https://en.wikipedia.org/wiki/Ethereum, last accessed September 27, 2024. A "smart contract" is a "computation that takes place on a blockchain" and "can be regarded as a secured storage procedure, as its execution and codified effects (like the transfer of tokens between parties) cannot be manipulated without modifying the blockchain itself." https://en.wikipedia.org/wiki/Smart_contract, last accessed September 27, 2024. On the Ethereum blockchain, "[t]he ERC-20 Token Standard allows for fungible tokens" and smart contracts that properly implement the standard "keep track of created tokens on Ethereum." https://en.wikipedia.org/wiki/Ethereum, last accessed September 27, 2024. Rivetz Intl. retained a third-party developer based in Gibralter, TokenMarket Ltd., to develop the RvT branded smart contract used to track the RvT tokens issued in the ICO. The RvT smart contract met the ERC-20 Token Standard and was essentially identical to smart contracts TokenMarket created for other customers. Rivetz did not modify the code received from TokenMarket and at the time of the ICO, RvT tokens had the same functionality as other generic ERC-20 tokens on the Ethereum blockchain.

C.   The White Paper

On June 29, 2017, just under a month after announcing the ICO, Rivetz, Intl. published a White Paper, primarily authored by Sprague, which described efforts by Rivetz to build "a Global Attestation and Identity Network, powered by the Rivetz Token (RvT)." (Excerpt of June 29, 2017

White Paper, Dkt. No. 36-6 at 4.) Rivetz presented itself as "a 'first-mover' with patent pending cybersecurity services and capabilities," and an "existing platform [that] provides a unique set of market-leading solutions that have already generated over a million dollars in recent contract awards." (*Id.* at 6.) The White Paper explained that the proliferation of mobile devices, including Internet of Things (IoT) devices, raises cybersecurity problems and said Rivetz was working to create technology that would solve this problem. More specifically, the White Paper outlined Rivetz's "vision of a global ecosystem" in which RvT tokens would be used to validate data and transactions across a decentralized network. (*Id.* at 10.) Descriptions of industry demand for better security tools for mobile devices; the "Rivetz solution," combining trusted computing and blockchain technology; the functional role of RvT tokens; and the expertise of the "Rivetz team" painted an optimistic picture of the market for Rivetz's cybersecurity service and, by extension, future demand for RvT tokens.

Large figures were used to demonstrate a rapidly growing market for the type of security tool Rivetz was developing. In the very first paragraph of the Executive Summary, the White Paper cited an independent forecast that cybersecurity damages were expected "to total more than $6 trillion globally, up from $3 trillion in 2015." (*Id.* at 4.) Further down the same page, the White Paper cited an estimate that internet-connected "Internet of Things" (IoT) devices were likely "to exceed 200 billion by 2020" and then suggested most of those devices would require additional technology to be able to keep data secure. (*Id.*) Several pages later, the White paper said, without citation, that "[f]orecasts estimate $4 trillion in revenue by 2020" from IoT sales and that "forecasters believe growth will rapidly accelerate shortly after 2020." (*Id.* at 9.) The $6 trillion loss figure was referenced again near the end of the White Paper, where it was followed by citations to forecasts "that global

8

spending on cybersecurity products and services will exceed $1 trillion cumulatively over the next five years," and that there will be "12-15 percent year-over-year market growth through 2021." (*Id.* at 18[1].)

A section headed "The Problem," which described security threats facing mobile and IoT devices, was immediately followed by a section headed "The Global Attestation and Identity Network powered by RvT." (*Id.* at 9-10.) The latter section identifies a "new paradigm for cybersecurity" created by combining Trusted Computing and blockchain technology and positions RvT tokens as an integral, and unique, part of the Rivetz solution. The RvT token is variously described as "designed to explore the full value of the paradigm," "intended to provide operational security and enable the business model for integrity validation and attestation of transactions in real time," and "purpose designed to integrate with the data structures and methods that are required by the Trusted Computing Group and Global Platform standards to assure that devices have provable capabilities." (*Id.* at 10.) In the section of the White Paper describing how the Rivetz security network would work, RvT tokens are described as "provid[ing] a new approach in the blockchain market." (*Id.* at 11.) Later, in a section headed "The business model for security," the White Paper stated that Rivetz's cybersecurity controller would enable a verification process that "will require an RvT token to operate." (*Id.* at 22.)

The White Paper did not clearly identify whether Rivetz had functional versions of any of the technology needed to launch its Global Attestation and Identity Network or suggest a timeline for growing the ecosystem. One particular heading, "Putting RvT to work – the next 6 months," helped create the impression, reinforced throughout the White Paper, that Rivetz had a functional security tool ready to utilize RvT tokens and demand for RvT tokens was likely to grow as the tool was improved and adopted more widely. Isolated statements that described the RvT token as an ERC-20 token and suggested Rivetz's goal was to enable "every token and chain [to] take advantage of [its]

---

[1] As each of the three pages between pages 17 and 21 is designated as page 20, the court refers to the actual location of the page in the document, rather than its page number.

cybersecurity controls" did not clearly conflict with the numerous vague statements suggesting RvT tokens would play a unique and functional role in the Rivetz security ecosystem. (*Id.* at 5.)

Readers of the White Paper also learned "the Rivetz team" had "years of experience and leadership in trusted computing and blockchain technologies," had "secured over a million dollars in contracted revenue from the U.S. government for other projects," "was part of the founding of the Trusted Computing Group in 2000," had "been an active blockchain contributor since 2013," "played a critical role in the creation, development, and adoption of Trusted Computing," and had "been part of the governance in [the cybersecurity] industry for the last 20 years, driving the adoption of trusted computing hardware and developing the technology services and economic models to put trusted computing to work." (*Id.* at 5-6.)

### D. The Initial Coin Offering

The ICO commenced less than two weeks after the White Paper was published. TokenMarket created the smart contracts and marketed the ICO to potential investors in the United States, Europe, and China. Sprague also promoted the ICO by drafting the White Paper, sitting for an interview with a U.S.-based podcast, and making presentations to organizations and individuals. The ICO proceeded in two phases: a Pre-Sale, which ran from July 10, 2017 through August 9, 2017, during which there was a minimum purchase of 50,000 tokens, and a Crowdsale, which ran from August 10, 2017 through September 10, 2017, during which there was no minimum purchase. Rivetz Intl. created 200 million RvT tokens prior to the ICO and stated it would sell up to 70 million through the ICO: 45 million during the Pre-Sale and 25 million during the Crowdsale. Another 70 million tokens were allocated to the Rivetz Intl.'s Company Inventory and the final 60 million were also controlled by Rivetz Intl., though they were designated for incentives to promote adoption of the Rivetz cybersecurity ecosystem. Only about 30 million of the available RvT tokens were sold during the ICO and under

the terms of the ICO, the unsold RvT tokes were added to Rivetz Intl.'s Company Inventory, resulting in Rivetz Intl. controlling approximately 85% of the total RvT tokens after the ICO.

Approximately 7,400 purchasers participated in the ICO and 35% of the RvT tokens were purchased through IP addresses located in the United States. The terms for the ICO excluded purchases from New York state or by a person residing or domiciled in New York. No restrictions were placed on sales related to other states and potential purchasers were not screened using "know your customer" or anti-money laundering procedures. Rivetz also did not file a registration statement prior to the ICO. During the Pre-Sale, the SEC issued an investigative report in which it cautioned that initial coin offerings and token sales might be subject to federal securities law. (July 25, 2017 SEC Report, Dkt. No. 45.) Sprague reviewed the report while the ICO was ongoing and elected to continue with the ICO.

The terms applicable to both the Pre-Sale and Crowdsale required purchasers to pay using ether and stated purchasers were making a binding agreement and all token purchases were final unless expressly provided otherwise or required by law. Rivetz Intl. received approximately 50,000 to 60,000 ether, which at the time, was equivalent to about $17 to $18 million. Purchasers were also warned that the "Company may have to make changes to the specification of the Tokens," and reserved the right to migrate to another protocol in the future. (Pre-Sale Terms, Dkt. No. 37-2 at ¶ 6(d); Crowdsale Terms, Dkt. No. 43 at ¶ 6(d).)

An exhibit attached to the terms for the both the Pre-Sale and the Crowdsale described the technology Rivetz Intl. was developing as "seek[ing] to provide cybersecurity services and capabilities that leverage the Trusted Execution Environment (TEE), which is an isolated execution environment . . . already built into billions of existing devices." (Pre-Sale Terms Ex. C, Dkt. No. 44 at 5; Crowdsale Terms Ex. C, Dkt. No. 36-43 at 14.) The exhibit stated that Rivetz Corp. had already developed some components of the technology, described how the technology would operate "once fully developed."

(*Id.*) Specifically, the exhibit explained that Rivetz Intl. would work to build an Ecosystem in which Rivetz Intl. and "third-party service providers will utilize [the RvT token] to offer their products and services to Ecosystem participants in exchange for [RvT] Tokens and, as a result, the utility of the [RvT] Tokens may grow over time to the extent that more participants and services are added to the Ecosystem." (*Id.*)

The smart contracts used to issue RvT tokens were transferrable immediately after the ICO and had the functionality shared by other ERC-20 smart contracts. However, the Rivetz Ecosystem did not yet exist. Third-party developers did not yet have the tools needed to engage with the Ecosystem and the RvT tokens had no unique attributes that enabled purchasers to use them to obtain the types of security services described in the White Paper and the exhibit attached to the ICO terms. .

## IV.    ANALYSIS

The Securities Act, as enforced by the SEC, "afford[s] broad protection to investors." *Howey*, 328 U.S. at 301. Sections 5(a) and 5(c) makes it unlawful for any person, directly or indirectly, to sell, deliver, offer to sell, or offer to buy a security through any means of interstate commerce "[u]nless a registration is in effect as to [the] security" or a statutory exception applies. 15 U.S.C. § 77e(a). Congress defined securities broadly and the regulatory regime applies to "a wide array of financial instruments," including "the elusive, essentially protean, concept of an investment contract." *SEC v. SG Ltd.*, 265 F.3d 42, 46 (1st Cir. 2001). Although an "investment contract" is not defined in the Securities Act, the Supreme Court has explained that "[i]t embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 at 99. Under the long-established *Howey* test, "an investment contract comprises (1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the

promoter or a third party." *SG Ltd.*, 265 F.3d at 46. The Supreme Court intended the test to provide "a broad construction of what constitutes an investment contract" and courts applying the test must look past form and apply the test "in light of the economic realities of the transaction." *Id.* at 46-47.

The undisputed facts here clearly establish that Sprague personally promoted the ICO in the United States and knew that no registration statement was filed prior to the ICO. It is also undisputed that RvT tokens were offered for sale in the United States to purchasers residing or domiciled in any state other than New York and that approximately 1/3 of the RvT tokens were, in fact, purchased by buyers in the United States. Though purchasers were required to pay for RvT tokens using ether, rather than a fiat currency, the consideration they provided meets the money requirement of the first *Howey* factor. *See Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979) (reviewing Securities Act cases in which the investment of money element was satisfied where "the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security").

Focusing on the presence of certain disclaimers in the terms accepted by ICO purchasers and the functionality RvT tokens had because they met the ERC-20 standard, Sprague argues the second and third *Howey* factors were not present in the ICO. His argument might be meritorious were the court required to credit contractual formalities and limiting language included in documents provided to purchasers participating in the ICO; however, the opposite is true. *See Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (explaining that an "interest may be treated as a security, even if not so labeled," because the "promotor properly is held to his representation as to what he is selling, even where those promises go well beyond the legal terms of the contracts and the fine print of the disclaimers." (internal citation omitted)). This court must look to the economic realities of the transaction, especially the language used to encourage potential purchasers. *Id.*

A. Common Enterprise

The First Circuit has held "that a showing of horizonal commonality—the pooling of assets from multiple investors in such a manner that all share in the profits and risks of the enterprise—satisfies" the common enterprise element of the *Howey* test. *SG Ltd.*, 265 F.3d at 50. The undisputed facts leave no question that horizontal commonality existed in this case. Sprague announced that Rivetz was pursuing the ICO to raise funds for its work developing security technology for mobile devices. Through the White Paper, he encouraged potential purchasers to view the purchase of RvT tokens as an opportunity to invest in the security solution Rivetz was developing and reap a financial reward as Rivetz's technology increased demand for RvT tokens.

From the first announcement of the ICO on June 1, 2017, RvT tokens were described as a functional part of the Rivetz security ecosystem. Individual purchasers could separately access their RvT tokens, but the tokens' value was dependent on future demand and usability of the tokens. The White Paper told potential purchasers that Rivetz had a viable security product poised to fill significant market demand and the product's success would drive demand for RvT tokens, increasing their value. Similarly, exhibits to the ICO terms provided to purchasers described how Rivetz hoped to use proceeds from the ICO to further development of its security tools and how that would drive demand for RvT tokens because each device using the tools would need some amount of RvT tokens.

The structure of the ICO also ensured Rivetz would retain a significant amount of RvT tokens following the ICO. Since the RvT tokens had no unique functionality at the time of the ICO, the fortunes of Rivetz and other RvT token owners were linked to the successful development of the Rivetz security ecosystem. Rivetz would, of course, directly benefit from bringing a successful security product to market. Additionally, if the product created demand for RvT tokens, the value of RvT tokens would increase, benefitting all holders, including Rivetz, in proportion to the amount of RvT tokens each held, a clear demonstration of commonality. *S.G. Ltd.*, 265 F.3d at 51 (finding of

horizontal commonality supported where a purchaser's expected profit was "directly proportional to the size of his or her investment"); *see also SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178-79 S.D.N.Y. 2020) (finding a common enterprise where money raised by selling a digital token was used to fund the construction of the digital ecosystem in which the token could be used).

### B. Expectation of Profit Based on the Efforts of Others

The final element of the *Howey* test for investment contracts is met when there is an expectation of profits solely from the efforts of others. "The Supreme Court has recognized an expectation of profits in two situations, namely, (1) capital appreciation from the original investment, and (2) participation in earnings resulting from the use of investors' funds." *S.G. Ltd.*, 265 at 53. In contrast, there is no expectation of profit where "an individual purchases a commodity for personal use or consumption." *Id.* Although this part of the *Howey* test uses the word "solely," "[t]he courts of appeals have been unanimous in declining to give literal meaning to the word." *Id.* at 55. Instead, the requirement is met "as long as 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Id.* (quoting *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973)).

From the first announcement of the ICO through its completion, Rivetz and Sprague made statements to potential purchasers that clearly tied the value of RvT tokens to Rivetz's goal of creating a security ecosystem for mobile devices. Both the White Paper and exhibit to the ICO terms described the RvT token as a necessary component of the security ecosystem, such that growth of the ecosystem would increase demand for RvT tokens, thereby increasing their value. At the time of the ICO, the ecosystem did not yet exist and Rivetz had not released development tools that others could use to help build the ecosystem. The RvT tokens were functional as ERC-20 tokens, but they had no additional uses or inherent value because Rivetz did not yet have a functional security ecosystem.

Without such an ecosystem, holders could not use their RvT tokens to obtain the security services described by Rivetz. As a result, the value of purchasers' RvT tokens was directly dependent on Rivetz's entrepreneurial efforts to build and market the technology needed to create a security ecosystem.

### V.     CONCLUSION

For the foregoing reasons, the SEC's motion for summary judgment is granted (Dkt. No. 36) and Sprague's motion for summary judgment is denied (Dkt. No. 37). The SEC shall confer with Sprague and file a proposed judgment for injunctive and monetary relief on or before October 22, 2024. Sprague shall file any objections to the proposed judgment on or before November 5, 2024.

It is So Ordered.

  /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge